******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ERIC HAM *v.* COMMISSIONER OF CORRECTION
## (AC 37998)

Alvord, Keller and Flynn, Js.

*Syllabus*

The petitioner, who had been convicted of murder and several other crimes in connection with the shooting death of the victim, sought a writ of habeas corpus, claiming, inter alia, that he was deprived of his right to due process because the prosecutor at his criminal trial failed to disclose material exculpatory evidence. The state's theory of the case was premised on the shooting having occurred at 2:20 a.m. Hospital records showed that the petitioner had been admitted at 2:49 a.m. seeking treatment for a gunshot wound that he claimed to have received when he was accosted on a street in an attempted robbery. L, a police sergeant, testified for the state that she had been dispatched at 2:05 a.m. to meet with the petitioner in the hospital. The prosecutor thereafter recalled L, who testified that after her initial testimony, she checked her daily notebook and the police department's activity log, and realized that her previous testimony was inaccurate and that she had been dispatched at 2:48 a.m. to meet the petitioner in the hospital. In his habeas petition, the petitioner alleged, inter alia, that after L's initial testimony, the state asked her to produce evidence that contradicted her prior testimony that she had been dispatched at 2:05 a.m. to meet with the petitioner in the hospital, and that the prosecutor knew that L's corrected testimony was false. The petitioner also claimed that the prosecutor was aware of and did not disclose to the defense that L had been involved in an incident five years earlier in which she fatally shot a suspect during an arrest and that she was subject to prosecution for it at the time that she testified at the petitioner's criminal trial. The petitioner further alleged that H, one of his prior habeas counsel, had rendered ineffective assistance because, inter alia, she failed to pursue a claim that D, the petitioner's criminal trial counsel, had rendered ineffective assistance by failing to adequately challenge L's testimony about what time she was dispatched to meet with the petitioner in the hospital and L's motivation to testify falsely against him. The habeas court rejected the petitioner's claims and rendered judgment denying the habeas petition. Thereafter, the habeas court denied the petition for certification to appeal, and the petitioner appealed to this court. *Held*:

1. The habeas court properly denied the petition for certification to appeal with respect to the petitioner's claim that the prosecutor failed to disclose material exculpatory evidence concerning L, the petitioner having failed to demonstrate that the issues he raised were debatable among jurists of reason, that a court could have resolved them in a different manner or that they deserved encouragement to proceed further: the petitioner's ability to confront L at trial was not undermined to any significant degree by the prosecutor's failure to disclose the information at issue, which lacked an appreciable potential to have altered the jury's assessment of L's credibility, none of the facts surrounding L's role in the fatal shooting of the suspect five years earlier supported a reasonable inference that she was under a threat of prosecution at the time of the petitioner's criminal trial, a police internal affairs report that stated that L had been directed to undergo counseling after the fatal shooting did not reasonably support an inference that her reputation in the police department was tarnished or that her job was in jeopardy at the time of the petitioner's criminal trial, and there was no merit to the petitioner's claim that L had a motive to commit perjury and to fabricate evidence to support her corrected trial testimony; moreover, even if the prosecutor suppressed evidence that was favorable to the defense, the petitioner did not demonstrate that it was material, as the materiality of the evidence was inextricably linked to the petitioner's theory, which relied on inferences that were not at all reasonable, that L committed perjury and fabricated evidence to support the state's case and to curry favor with the Office of the State's Attorney.

2. The habeas court did not abuse its discretion in denying the petition for

certification to appeal with respect to the petitioner's claim that H rendered ineffective assistance: because the petitioner failed to prove that he was prejudiced by D's performance, he was unable to demonstrate that he was prejudiced by H's failure to pursue claims that were related to D's performance, as the petitioner relied on facts that were not explored during D's cross-examination of L, the inferences on which the petitioner relied were unreasonable in that they were not logically drawn from the facts in evidence, and his claim of prejudice as to D was unsubstantiated to the extent that it was based on D's failure to cross-examine L about her testimony that she had not referred to additional resources for her corrected testimony other than her personal notebook and the police daily activity log; moreover, the petitioner did not dispute that L's corrected testimony was consistent with police department records and corroborated by hospital records, and the avenues of inquiry that the petitioner claimed that D should have pursued were not likely to have been persuasive to the jury, as they were not logically related to the evidence and the reasonable inferences to be drawn therefrom.

Argued September 18, 2018—officially released January 15, 2019

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Fuger, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed.*

*Vishal K. Garg*, for the appellant (petitioner).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Rebecca A. Barry*, assistant state's attorney, for the appellee (respondent).

*Opinion*

KELLER, J. The petitioner, Eric Ham, appeals from the judgment of the habeas court denying his petition for certification to appeal from the court's denial of his third amended petition for a writ of habeas corpus. The petitioner claims that the habeas court abused its discretion in denying his petition for certification to appeal with respect to his claims that (1) the prosecutor at his criminal trial violated his right to due process by failing to disclose material exculpatory evidence and (2) counsel in a prior habeas action deprived him of his right to the effective assistance of counsel by failing to pursue a claim of ineffective assistance on the part of his criminal trial counsel. Because we conclude that the court properly exercised its discretion in denying the petition for certification to appeal, we dismiss the appeal.

The following facts and procedural history are relevant to the present appeal. In 1996, following a jury trial, the petitioner was convicted of murder in violation of General Statutes § 53a-54a (a), conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a (a), assault in the first degree in violation of General Statutes § 53a-59, larceny in the third degree in violation of General Statutes § 53a-124 (a) (1), conspiracy to commit larceny in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-124 (a) (1), and falsely reporting an incident in violation of General Statutes (Rev. to 1993) § 53a-180 (a) (3) (A). The court, *Hon. William L. Hadden, Jr.*, judge trial referee, sentenced the petitioner to a fifty-year term of imprisonment.

The petitioner brought a direct appeal, during which he was represented by Attorney William S. Palmieri. This court affirmed the judgment of conviction, and our Supreme Court denied the petitioner's petition for certification to appeal from this court's judgment. *State v. Ham*, 55 Conn. App. 281, 739 A.2d 1268, cert. denied, 252 Conn. 916, 743 A.2d 1128 (1999).[1] This court summarized the facts that reasonably could have been found by the jury: "[I]n March, 1993, the [petitioner], accompanied by four masked men, approached Alex Santana and asked him where to find his cousin, George Flores. When Santana replied that he had not seen Flores, the [petitioner] punched Santana in the face, causing him to be thrown against a store window. The owner of the store came outside and the [petitioner] and his companions departed.

"On May 5, 1993, at approximately 11 p.m., the [petitioner] agreed to pay Ronaldo Rivera $40 if he would steal a large, fast, four door automobile and deliver it to the [petitioner]. Rivera found such a vehicle on Frank Street in New Haven and, with the help of a friend, stole a four door Buick and brought the car to the

[petitioner] and another man on Ward Street at approximately 2 a.m.

"Santana had been riding that night in the car of his friend, Butch Console, with three other persons, Marilyn Torres, Melissa Dawson and Dimiris Vega. When the car stopped on Button Street, the occupants got out. As they were standing by the car, a man approached and offered to paint Console's initials on the driver's door. Console agreed and then stood next to a red station wagon parked on the opposite side of the street. Meanwhile, his friends stood on the street side of Console's car watching the man paint. Console noticed a car approaching slowly on Button Street. He saw what he first thought were firecrackers coming from the rear seat of the car. When he realized it was gunfire, Console ran around the front of the station wagon to the sidewalk and knelt to avoid the bullets. The approaching car was the stolen Buick and contained the [petitioner] and three companions. Gunfire erupted from the area of the rear seat of the Buick. One bullet hit Santana in the stomach, resulting in his hospitalization. Another bullet struck Torres in the back, causing her death. The evidence indicated that at least five shots were fired from close range.

"A few minutes later, the [petitioner] and his companions crashed the Buick on Howard Avenue and abandoned it with the motor running, the rear door open, a bullet casing on the floor behind the driver's seat, and a sheet covering the rear seat wet with blood. The rear window had been blown out. A second shell was found on the roof of the car, and a third was found on Button Street at the shooting scene. The [petitioner] went to the Hospital of [Saint] Raphael (hospital) at 2:49 a.m. to seek treatment for a gunshot wound. He spoke with a New Haven police officer at 3:05 a.m. He gave a statement to Sergeant Diane Langston declaring that he and his friend had been accosted and shot on the street in an attempted robbery by two masked men. The [petitioner] stated that he and his friend then ran directly to the hospital.

"A ballistics expert testified that the bullet obtained from Torres' body matched the .45 caliber shell casing found on the floor of the Buick. The other casings found on the roof of the Buick and on Button Street came from a nine millimeter gun. A fingerprint expert identified fingerprints found on the interior of the driver's door as those of the [petitioner]. Experts from the state forensic laboratory testified that the blood on the sheet covering the backseat was consistent with the [petitioner's] blood type." Id., 283–85.

In 2012, the petitioner filed an initial petition for a writ of habeas corpus and, in December, 2014, he filed the operative, third amended petition.[2] In his petition, the petitioner raised six claims. The claims raised in the present appeal relate to the court's denial of portions

of the first and sixth counts of the petition.

In the first count, the petitioner claimed that he was deprived of his right to due process because the prosecutor at his criminal trial, John Waddock, failed to disclose "material exculpatory evidence." The petitioner alleged that this included evidence that the defense could have used to impeach two of the state's witnesses, namely, Langston and Santana. Langston is a retired sergeant of the New Haven Police Department who, as a patrol officer in 1993, met with the petitioner during the early morning of May 6, 1993, and was a witness for the state at his criminal trial. Central to the petitioner's claims concerning Langston is the fact that, on January 8, 1997, she testified, consistent with her police report in this matter, that, on May 6, 1993, she was dispatched to meet with the petitioner at the hospital at 2:05 a.m. On January 13, 1997, the prosecutor recalled Langston as a witness for the state, and Langston testified that, following her initial testimony in this case, and on her own initiative, she checked her personal daily notebook as well as the police activity log maintained by her department. Relying on these records, Langston realized that, with respect to the specific time at which she had been dispatched to meet with the petitioner, her previous testimony was inaccurate. During her later testimony, she stated that, on May 6, 1993, she had been dispatched to meet with the petitioner at 2:48 a.m. It is undisputed that the time at which Langston had been dispatched to meet with the petitioner was significant in light of the fact that the state's theory of the case was premised on the shooting having occurred at 2:20 a.m.

Pertinent to the claims raised in the present appeal, the petitioner alleged that the prosecutor was aware of, but did not disclose information that the defense could have used to challenge Langston's credibility, particularly with respect to her testimony concerning the time at which she had been dispatched to meet with him at the hospital on May 6, 1993. Specifically, the petitioner alleged that the prosecutor failed to disclose that "Langston was involved in a previous incident for which she was subject to prosecution at the time she testified at the petitioner's criminal trial," and that, "[o]n January 8, 1997, [following her initial testimony at the petitioner's criminal trial] the prosecuting authority asked . . . Langston to obtain and produce evidence contradicting her prior testimony that she had been dispatched to speak with the [petitioner] at 2:05 a.m. on May 6, 1993." The petitioner alleged that there is a reasonable probability that, had the evidence at issue been disclosed to the defense in a timely manner, the outcome of the trial would have been more favorable to him.

In the second count, the petitioner claimed that he was deprived of his right to due process because the prosecutor presented testimony from Langston and

Santana that the prosecutor knew or should have known to be false, and that the prosecutor failed to correct their testimony. As relevant to the claims raised in the present appeal, the petitioner alleged that, during her trial testimony after she was recalled as witness by the prosecutor, Langston falsely testified "that she was dispatched to meet with [the petitioner] at 2:48 a.m. on May 6, 1993, and . . . that she checked her personal notebook and daily activity logs on January 8, 1997, of her own volition." The petitioner alleged that, but for the false testimony, the outcome of the trial would have been more favorable to him.

In the third count, the petitioner claimed that he was deprived of his right to the effective assistance of counsel because his trial counsel, William F. Dow, was deficient in several respects. As relevant to the claims raised in the present appeal, the petitioner alleged that Dow "failed to adequately cross-examine, impeach, or otherwise challenge the testimony of Diane Langston concerning the time she was dispatched to meet with the petitioner and her motivation to testify falsely against the petitioner . . . ." The petitioner alleged that there was a reasonable probability that, absent Dow's deficient performance, the outcome of the trial would have been more favorable to him.

In the fourth count, the petitioner claimed that he was deprived of his right to the effective assistance of counsel because his appellate counsel, William S. Palmieri, failed to raise certain claims of error. The petitioner alleged that there was a reasonable probability that, absent Palmieri's deficient performance, the outcome of his direct appeal would have been more favorable to him.

In the fifth count, the petitioner claimed that he was deprived of his right to the effective assistance of counsel because prior habeas counsel, Frank Cannatelli, failed to raise or failed adequately to pursue the four claims that he previously raised in the present petition. The petitioner alleged that there was a reasonable probability that, absent Cannatelli's deficient performance, the outcome of his prior habeas action would have been more favorable to him.

In the sixth count, the petitioner claimed that he was deprived of his right to the effective assistance of counsel because his prior habeas counsel, Hilary Carpenter, was deficient in a number of ways. Specifically, the petitioner argued that Carpenter failed to raise or failed adequately to pursue the five claims that he previously raised in the present petition. One aspect of his claim concerning Carpenter's representation was that she failed to pursue a claim of ineffective assistance arising from Dow's failure "to adequately cross-examine, impeach, or otherwise challenge the testimony of . . . Langston concerning the time she was dispatched to meet with the petitioner and her motivation to testify

falsely against the petitioner . . . ." The petitioner alleged that there was a reasonable probability that, absent Carpenter's deficient performance, the outcome of his prior habeas action would have been more favorable to him.

The respondent, the Commissioner of Correction, denied the substantive allegations in the petition. By way of defenses, the respondent alleged that, to the extent that the petitioner was raising claims that could have been raised in his direct appeal, in prior habeas actions, or in prior appeals in habeas actions, he was procedurally defaulted from doing so because "[he] has deliberately bypassed the opportunity to contest said issues," and has not shown cause and prejudice as to why such claims were not raised previously. Additionally, the respondent alleged that, to the extent that the petitioner was attempting to relitigate issues that had been raised and decided in his direct appeal, his prior petitions, or in prior appeals in habeas actions, he was barred from doing so under the doctrine of res judicata. Finally, relying on the petitioner's history of filing habeas petitions, the respondent raised the defense of abuse of the writ. In the petitioner's reply to the return, he alleged that none of the defenses relied on by the respondent applied to his claims.

During the course of three days in January, 2015, the court, *Fuger, J.*, held a hearing concerning the petition. With respect to the claims set forth in the petition, the petitioner presented the testimony of nine witnesses. These included himself; Dow; Waddock; Palmieri; Cannatelli; Carpenter; Langston; Jason Minardi, a lieutenant with the New Haven Police Department who previously had been the officer in charge of its internal affairs division; and Roy Olson, a retired captain of the New Haven Police Department who supervised its internal affairs division for seven years. The court received several exhibits and, at the conclusion of the trial, both parties filed posttrial briefs.

In its lengthy memorandum of decision filed April 24, 2015, the court addressed all of the claims raised in the petition. In parts I and II of this opinion, we discuss in greater detail those portions of the habeas court's decision that are relevant to the claims raised in the present appeal. At this juncture, it suffices to discuss generally the parameters of the court's decision. In counts one and two of the petition, the petitioner alleged violations of his right to due process resulting from the prosecutor's failure to disclose exculpatory evidence concerning Langston and Santana. Insofar as these claims related to Langston, the court rejected them on their merits. Insofar as these claims were related to Santana, the court deemed the claims to be abandoned.

The court also rejected the claims raised in counts three, four, and five of the petition. The court, relying

on the petitioner's history of filing habeas petitions, concluded that the respondent properly invoked the defense of res judicata and that it barred litigation of the claims of ineffective assistance on the part of Dow, Palmieri, and Cannatelli.

Furthermore, the court rejected the claim raised in count six, in which the petitioner alleged ineffective assistance on the part of Carpenter for failure to pursue claims of ineffectiveness on the part of Dow, Palmieri, and Cannatelli. The court rejected each aspect of this claim on its merits.

Finally, the court addressed the respondent's defense of abuse of the writ. In a comprehensive analysis of the issue, the court concluded that the petitioner had abused the writ. Particularly troubling in the court's view were the claims of impropriety directed at the prosecutor, concerning whom the court found "no evidence whatsoever showing any misconduct or impropriety." The court concluded that, although it believed that the petitioner had abused the writ, it declined to dismiss the petition in light of the fact that the petitioner's claim of ineffective assistance on the part of Carpenter had not previously been raised and adjudicated.

Following the court's denial of the petition for a writ of habeas corpus, the petitioner filed a petition for certification to appeal. See General Statutes § 52-470. The petition encompassed the rulings which are the subject of the present appeal. The court denied the petition. This appeal followed. Additional facts will be set forth as necessary.

Before we reach the merits of the petitioner's claims, we discuss his burden in demonstrating that he is entitled to relief. "Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits. . . .

"To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petition-

er's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. . . .

"In evaluating the merits of the underlying claims on which the petitioner relies in the present appeal, we observe that [when] the legal conclusions of the court are challenged, [the reviewing court] must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record. . . . To the extent that factual findings are challenged, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous . . . . [A] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, 174 Conn. App. 776, 785–86, 166 A.3d 815, cert. denied, 327 Conn. 957, 172 A.3d 204 (2017).

I

First, we address the petitioner's claim that the court improperly denied his petition for certification to appeal with respect to his claim that the prosecutor violated his right to due process[3] by failing to disclose material exculpatory evidence. We disagree with the petitioner.

As we previously stated, in count one of his amended petition for a writ of habeas corpus, the petitioner alleged in relevant part that the prosecutor was aware that (1) "Langston was involved in a previous incident for which she was subject to prosecution at the time she testified at [his] criminal trial," and (2) "[o]n January 8, 1997, the prosecuting authority asked . . . Langston to obtain and produce evidence contradicting her prior testimony that she had been dispatched to speak with [the petitioner] at 2:05 a.m. on May 6, 1993." The petitioner alleged that the prosecutor failed to disclose this information to the defense, this information was "exculpatory or otherwise favorable evidence that should have been disclosed to [him] or his counsel prior to his criminal trial," and the evidence was "material because there is a reasonable probability that—had it been disclosed in time to be used by the defense during [his] criminal trial—the result of [his] trial would have been different and more favorable to [him]." As we discussed previously, in count two, the petitioner alleged in relevant part that the prosecutor presented false testimony from Langston, specifically, her testimony that (1) she was dispatched to meet with the petitioner at 2:48 a.m., on May 6, 1993, and (2) on January 8, 1997, following her initial trial testimony, she voluntarily checked her daily activity notebook in an effort to verify the accuracy of her testimony concerning the time at which she had been dispatched to meet

with the petitioner.

In rejecting this claim concerning the prosecutor's conduct, the court set forth detailed factual findings. The court stated in relevant part: "The court will begin its discussion with the direct appeal from the criminal conviction, where the [petitioner's] second claim . . . [was] based on the admission into evidence of hospital records relating to the [petitioner's] visit to the hospital for treatment of the gunshot wound that he claimed to have received in the attempted robbery. The following additional facts [were] necessary for [the Appellate Court's] resolution of this claim. The hospital records indicated that the [petitioner] was admitted at 2:49 a.m. on the morning of the crimes. [During the petitioner's criminal trial on January 8, 1997] Sergeant Langston . . . testified that she had taken a statement from the [petitioner] at the hospital shortly after 2:05 a.m. Because the state claimed that the shooting occurred at 2:20 a.m., Langston's testimony would have provided the [petitioner] with an alibi if it were correct. [On January 13, 1997] [t]he state called Langston to testify once again after the introduction of the hospital records. It also introduced into evidence, over the [petitioner's] objection, two previously undisclosed statements by Langston, both of which indicated that she had not been dispatched to the hospital until 2:48 a.m. She testified that her earlier testimony was the result of human error. *State* v. *Ham*, supra, 55 Conn. App. 287. The Appellate Court concluded that the hospital records were properly admitted into evidence because the only purpose for introducing the hospital records was to explain the basis for Langston's correction of her previous testimony concerning the time of the [petitioner's] hospital visit . . . . Id., 289.

"This court finds the following additional facts. It is uncontroverted that Langston testified about the times of certain events when she first testified during the criminal trial on January 8, 1997. Attorney Dow cross-examined Langston about the times to which she testified on direct examination and offered her report, which corroborated her direct testimony, into evidence as a business record. . . . Dow argued [that the report was critical to establishing the petitioner's whereabouts in the hours following the shooting and that the report was not so cumulative so as to prejudice the state's case]. . . .

"Judge Hadden [acknowledged that the timing of events described by Langston was undoubtedly relevant with respect to the issues in the case, but] sustained the state's objection to portions of Langston's report becoming full exhibits because the report was cumulative to her testimony. . . .

"Attorney Dow then continued his cross-examination of Langston with a series of questions that sought to accentuate the times she had testified to. . . . The

prosecutor began his redirect examination by asking Langston about the accuracy she strives for in her reports and other recorded information. Langston acknowledged that she at times made mistakes in her reports. . . . The prosecutor then sought to question Langston about when she heard a radio broadcast concerning another incident on Button Street that occurred during the time that Langston had testified she was writing her report, to which defense counsel objected and the jury was excused. . . . The exchange between Judge Hadden and the prosecutor about the objection shows that [during his examination on January 8, 1997] the prosecutor was attempting to somehow show that the times testified to by Langston were incorrect. . . . [The prosecutor] ultimately withdrew his question." (Citations omitted; internal quotation marks omitted.)

The habeas court observed that, at the criminal trial and outside of the presence of the jury, the prosecutor and Judge Hadden engaged in a colloquy concerning Langston's testimony that, on the morning of the shooting, she spoke to the petitioner at the hospital at 2:05 a.m., as well as the evidence that the shooting occurred at 2:20 a.m. The habeas court observed that, during that colloquy, the prosecutor acknowledged that this discrepancy in the state's case could amount to "serious trouble" for the state.

The habeas court continued: "The jury then returned to the courtroom, and redirect examination continued with [the prosecutor] asking Langston about her having made, during the course of her career, mistakes in police reports as to times of events. . . . Dow then questioned Langston on recross-examination to emphasize the times that Langston had testified to and that she strives for accuracy in her reports. . . . Court then adjourned and resumed on January 13, 1997." (Citation omitted.)

The habeas court observed that, on January 13, 1997, Langston was recalled as a witness by the state and questioned about the accuracy of her prior testimony, on January 8, 1997, concerning the time at which she had been dispatched to meet with the petitioner at the hospital on May 6, 1993. The prosecutor asked Langston if she had referred to a police activity log as well as her daily notebook, neither of which she had with her during her testimony on January 8, 1997. Langston testified that she had occasion to review these materials. The prosecutor offered a page from Langston's daily notebook covering May 6, 1993, and Dow objected to its admission on the ground that the document had not been disclosed to the defense previously. Dow argued that the state, having been aware of the discrepancy in Langston's testimony concerning the time at which she had been dispatched to meet with the petitioner, should have disclosed the document to the defense on January 8, 1997, or, at the very latest, on the morning of January

13, 1997. Nonetheless, the court admitted the document from Langston's daily notebook as a full exhibit. Over Dow's objection, the court also admitted the daily activity log that was maintained by the police department. The court denied Dow's motion to strike Langston's testimony of January 13, 1997, observing that the state "[had] . . . a right to bring out through the offering of these exhibits and the testimony of this witness what, from the state's perspective, is the accurate [time] that this sergeant went to the hospital and when she interviewed the [petitioner]. The defense has full and ample opportunity to cross-examine her with respect to the contents of both of these exhibits. . . .

"The jury then returned to the courtroom and the direct examination of Langston continued, with the prosecutor asking a series of questions related to the notebook excerpt and the daily activity log that supported Langston's testimony that her prior testimony about when she was at [the hospital] was incorrect. . . . Langston acknowledged that the times she put in her report and testified to in her initial testimony [on January 8, 1997] were incorrect due to human error. . . .

"Dow used his cross-examination to emphasize [that] Langston's original testimony was correct and [to] undermine the credibility of her subsequent corrections. . . . Dow also questioned Langston as to how she came to realize that her initial testimony was incorrect . . . ." (Citations omitted; internal quotation marks omitted.)

The habeas court referred to the transcript of Dow's extensive cross-examination of Langston during the criminal trial on January 13, 1997, during which Dow elicited from Langston that, shortly after she left the courthouse after testifying on January 8, 1997, she reported for duty at the police department. Upon her arrival, she reviewed her personal notebook as well as the police daily activity logs. She testified that, with respect to the timing of when she had been dispatched to meet with the petitioner, she had " 'conducted [her] own investigation as to times' " and immediately noted her mistake concerning her testimony and the time that appeared in her report, the document on which she relied during her testimony on January 8, 1997. Thereafter, Dow elicited from Langston that she had not attempted to contact the prosecutor's office immediately, but spoke to an inspector in the prosecutor's office, whom she identified as "Ortiz," about the matter by telephone on Saturday, January 11, 1997. During Dow's examination, Langston acknowledged that it was important for a police officer who was testifying in a murder prosecution to be as accurate and complete as possible with respect to key facts. She testified that, during her initial testimony, she merely had relied on the time set forth in her police report. At that time,

Langston testified, she believed her report to be accurate.

The habeas court stated: "Dow then questioned Langston about whether she had spoken with any of the police detectives involved in the investigation of the petitioner's offenses, as well as whether she was aware that all police reports are signed under penalty for making a false statement." The court set forth a portion of Dow's cross-examination of Langston in which she testified that, on Saturday, January 11, 1997, she discussed with Ortiz the fact that her January 8, 1997 testimony was erroneous with respect to the time at which she had been dispatched to meet with the petitioner and that Ortiz instructed her to bring any relevant documents to court with her on Monday, January 13, 1997. As the court observed, Dow explored the times in Langston's report, the accuracy of the report at the time it was prepared, and the fact that she had reviewed the report three times prior to her initial testimony.

The court continued: "In the present matter . . . Langston testified on direct examination [during the habeas trial] that she spoke with [the prosecutor] about the times in her report after completing her initial testimony. According to Langston, she told [the prosecutor] that if there were any time errors in her report, those errors could be rectified by receiving other records maintained by the police department (e.g., the daily activity log). Langston again acknowledged, consistent with her testimony the second time she testified during the criminal trial, that she put incorrect times in her report, but that her personal notebook and the police activity log contained the correct times. Langston indicated that the likely source of the incorrect time in her report was the petitioner himself, because the report pertained to the incident in which the petitioner claimed that he and a friend had been the victims of a shooting and robbery.

"As to her history with internal affairs . . . Langston testified that she was unaware of having such a history prior to testifying in the petitioner's criminal trial. The officer-involved shooting [of Ronald Carney in 1992] in which Langston used deadly force to protect a fellow police officer occurred approximately five years prior to the petitioner's criminal trial and, as mandated by department policy, was investigated by internal affairs. . . . Langston acknowledged that she sought out counseling to help her deal with the trauma she experienced after the shooting. Langston was not charged with any offenses after the state's attorney's office also investigated the shooting.[4]

"[At the habeas trial, the prosecutor] presented brief testimony. Although he could not recall many of the details surrounding the underlying criminal case he prosecuted, [he] recalled that Langston testified twice and that the times she testified to the first time were

incorrect. [The prosecutor] could neither recall whether he asked Langston to find evidence showing her times were incorrect, nor if Langston told him that she could obtain documents that demonstrated the correct times, nor what he disclosed to the defense, nor whether he was aware of any internal affairs investigations into Langston. [The prosecutor] acknowledged that the timing of when Langston spoke with the petitioner at the hospital was in contention and that Langston corrected, with supporting documentation, her initially incorrect testimony during her second appearance.

"The petitioner's former defense counsel, Attorney Dow, testified [at the habeas trial] that part of the defense strategy evolved in tandem with Langston's report and initial testimony, which essentially would have made her the petitioner's alibi witness. Langston's initial testimony undeniably was helpful to the petitioner because he could not have been in the hospital giving a statement to Langston at the time the shooting occurred on Button Street. Thus, Dow strove to enhance her credibility when Langston first testified. Attorney Dow was not surprised by, and even anticipated, that the state would attempt to correct Langston's incorrect testimony. Knowing that such correction was forthcoming, Dow used that temporary advantage to the petitioner's benefit by engaging in plea negotiations with the state. The petitioner was not interested in accepting a plea agreement. When Langston returned to testify for the second time, Dow rigorously cross-examined her about her efforts to correct her testimony while also continuing to underscore the credibility of her initial testimony. However, Langston's corrected testimony was consistent not only with police department records, but was also corroborated by hospital records that showed the petitioner's admission time to be later than what was contained in Langston's [inaccurate] report.

"[At the habeas trial] Lt. Jason Minardi, who previously was the officer in charge of internal affairs for the New Haven Police Department . . . could not locate any disciplinary records pertaining to Langston. According to Minardi, a finding that there was no disciplinary violation would result in the purging of the internal affairs file three years after the investigation into the incident was completed. When wrongdoing is found, however, the files are retained for thirty years after someone is terminated or retires.[5] Counseling is not a form of discipline. Captain Olson, who prepared the memorandum regarding the 1992 officer-involved shooting, testified that he did not know if Langston was ever disciplined for the two off-duty incidents mentioned in his memorandum, nor did he know any other information about either disciplinary actions, if any, or whether Langston was charged with offenses. According to Olson, internal affairs reports were kept indefinitely until 1994, when the department's policy changed, at which point the purging [of files], including

retroactively purging of files where no misconduct was found, described by Lt. Minardi, began.

"Given the foregoing testimonies (which the court finds credible both individually and collectively), the court concludes that the petitioner has failed to show that the prosecutor was aware of Langston's prior officer-involved shooting, let alone that she was subject to prosecution for her action during that incident. The petitioner has also presented no credible evidence that the prosecutor asked Langston to obtain and produce evidence contradicting her initial testimony. The due process claims in count one as to Langston are without merit.

"As to the due process claim in count two as to Langston, the examination by the prosecutor and defense counsel during the first day she testified itself demonstrated to Langston that she needed to look into whether the times in her report were correct or whether she had erred when producing her report. If anything, both the state and Langston had an obligation to correct testimony that was incorrect. . . . Consequently, the claim in count two as it pertains to Langston, which alleges that the prosecutor knew or should have known Langston's initial testimony was false and failed to correct it, is incongruous." (Citations omitted; footnote in original; footnote added.)

Additionally, in rejecting the petitioner's argument that the nondisclosed evidence concerning Langston was material, the court stated: "The petitioner's post-trial brief makes the outlandish argument that 'the fact that Langston was potentially subject to prosecution for the shooting death of Ronald Carney [in 1992] provided her with a motive to fabricate evidence to comply with the prosecuting authority's request that she obtain evidence showing that her January 8, 1997 testimony was false, in order to avoid being prosecuted for the shooting of Carney.' Such argument has no basis in fact. It is the petitioner's argument that contains grandiose and fantastical reasons or motives for Langston fabricating evidence so that she could avoid being prosecuted for the shooting that occurred five years prior to the petitioner's trial." (Citation omitted.)

On appeal, the petitioner argues that the court improperly rejected his claim that the prosecutor failed to disclose (1) that Langston was involved in the shooting incident in 1992 "and that she had a lengthy internal affairs history that was described in an internal affairs report concerning that shooting,"[6] and (2) "that the prosecuting authority had requested that Langston obtain evidence contradicting her initial testimony about the time she was dispatched to meet with the petitioner." The petitioner argues that the court improperly determined that the prosecutor lacked knowledge of Langston's internal affairs history. In this regard, the petitioner argues that the habeas court ignored well

settled authority in support of the proposition that knowledge of any information known to the police department is imputed to the prosecutor, and that the prosecutor is under a duty to learn of and to disclose to the defense any information contained in police personnel files that is relevant to an officer's credibility. Moreover, the petitioner argues that the court improperly concluded that no credible evidence supported his claim that the prosecutor had asked Langston to obtain evidence contradicting her initial trial testimony. In this regard, the petitioner argues that the court found credible the prosecutor's testimony at the present habeas trial, but the court "apparently overlooked" evidence that, at a prior habeas trial, the prosecutor testified that, at the time of the criminal trial, he had, in fact, asked Langston to investigate in an effort to determine whether there was any evidence to support her corrected testimony.

"Whether the petitioner was deprived of his due process rights due to a . . . violation [under *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] is a question of law, to which we grant plenary review. . . . The conclusions reached by the [habeas] court in its decision to [deny] the habeas petition are matters of law, subject to plenary review. . . . Thus, [w]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record. . . . Also, [t]he habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous." (Citation omitted; internal quotation marks omitted.) *Stevenson* v. *Commissioner of Correction*, 165 Conn. App. 355, 363, 139 A.3d 718, cert. denied, 322 Conn. 903, 138 A.3d 933 (2016).

"It is well established that suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. . . . To establish a *Brady* violation the defendant bears the burden of demonstrating: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material." (Citations omitted; internal quotation marks omitted.) *Demers* v. *State*, 209 Conn. 143, 149–50, 547 A.2d 28 (1988). "If . . . the petitioner has failed to meet his burden as to one of the three prongs of the *Brady* test, then we must conclude that a *Brady* violation has not occurred." *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 296, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009).

"Under the last *Brady* prong, the prejudice that the defendant suffered as a result of the impropriety must

have been material to the case . . . . [T]he evidence will be deemed material only if there would be a reasonable probability of a different result if the evidence had been disclosed. . . . This standard is met if the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Citations omitted; internal quotation marks omitted.) *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 262–63, 112 A.3d 1 (2015); see also *Greene* v. *Commissioner of Correction*, 330 Conn. 1, 29, 190 A.3d 851 (2018) (discussing *Brady*'s materiality prong).

"It is well established that impeachment evidence may be crucial to a defense, especially when the state's case hinges entirely upon the credibility of certain key witnesses. . . . The rule laid out in *Brady* requiring disclosure of exculpatory evidence applies to materials that might well alter . . . the credibility of a crucial prosecution witness." (Internal quotation marks omitted.) *State* v. *Esposito*, 235 Conn. 802, 815–16, 670 A.2d 301 (1996).

Before the habeas court, the petitioner articulated an argument with respect to the materiality of the undisclosed information concerning Langston. The petitioner argued: "Langston had previously been involved in the shooting death of Ronald Carney. As a result of that incident, Lieutenant Roy Olson of the New Haven Police Department produced a memorandum regarding the shooting of Ronald Carney and the involvement of Diane Langston and other officers in that shooting. The memorandum outlined Langston's prior internal affairs history. The memorandum stated that Langston had two previous internal affairs files, each involving off-duty conduct. Langston also had several memoranda in her internal affairs files that were issued while she was in the training academy. Langston had accumulated all of these files in just over three years of service as a police officer. As a result of one of the internal affairs investigations and the memoranda from the training academy, Langston was told to see a doctor for counseling. Under New Haven Police Department policy, Langston would have been told to undergo counseling as a result of a pattern of behavior that was detrimental to the department. Had the prosecuting authority turned over the fact that Langston had been involved in the shooting death of Ronald Carney and the internal affairs reports of the local police department concerning the shooting, the defense would have been aware of all of the foregoing facts.

"The evidence concerning the shooting death of Ronald Carney and the fact that the prosecuting authority requested that Langston obtain a specific piece of evidence [related to the timing of when she had been dispatched to meet with the petitioner] . . . would have been relevant to the credibility of . . . Langston

because it tended to show that she had a motive to testify falsely in order to secure a conviction. First, the fact that Langston was potentially subject to prosecution for the shooting death of Ronald Carney provided her with a motive to fabricate evidence to comply with the prosecuting authority's request that she obtain evidence showing that her January 8, 1997 testimony was false, in order to avoid being prosecuted for the shooting of Carney. Additionally, Langston's lengthy internal affairs history and the fact that she specifically had been required to undergo counseling were all facts showing that she had engaged in conduct that was harmful to her reputation in the police department. It would have been reasonable for the jury to infer that Langston's reputation within the police department would have been further harmed had she provided the key piece of evidence that led to an acquittal in a high profile case and that she would fabricate evidence to avoid harming her reputation." (Footnotes omitted.) The petitioner continued his argument concerning materiality by emphasizing the importance of Langston's trial testimony. The petitioner raises similar materiality arguments before this court.[7]

We need not resolve the issue of whether the prosecution suppressed evidence concerning Langston that was favorable to the defense because, in our plenary review of the constitutional issue presented, we agree with the habeas court's assessment that the evidence, if admissible in whole or in part, was not material. The touchstone of a materiality analysis under *Brady* concerns the overall fairness of the trial and whether the prosecutor's failure to disclose undermines our confidence in the verdict. *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 263. We must consider "if the withheld evidence is of sufficient import or significance in relation to the original trial evidence that it reasonably might give rise to a reasonable doubt about the petitioner's guilt." Id. The prosecutor's failure to disclose information concerning Langston's internal affairs history and her involvement in the shooting death of Carney five years prior to the petitioner's criminal trial does not undermine our confidence in the verdict.

Langston's initial direct examination was brief; the substance of the testimony elicited from Langston by the prosecutor may be summarized as follows. Langston testified that she was dispatched to meet with the petitioner at the hospital at 2:05 a.m. on May 6, 1993. Thereafter, she spoke with the petitioner while he was in the emergency room, and he told her that he and a friend were leaving a store in New Haven when they were accosted by two black males. According to Langston, the petitioner told her that he sustained a gunshot injury when the men attempted to rob them and that he and his friend proceeded directly to the hospital. Certainly, Langston's testimony with respect to when she was dispatched to meet with the petitioner was an important

part of the state's case. It was not, however, the only evidence of when the petitioner was present at the hospital.[8]

The petitioner's ability to confront Langston was not undermined to any significant degree by the prosecutor's failure to disclose the information at issue because the information at issue lacked an appreciable potential to have altered the jury's assessment of Langston's credibility. The internal affairs report at issue refers extensively to the conduct of the three police officers who were involved in the incident during which Langston shot Carney, yet it does not suggest that Langston acted wrongfully or unlawfully during that incident. The report states, among other things, that Carney resisted when Officer Richard Pelletier attempted to handcuff him following a criminal trespass complaint. During the struggle, Carney struck another officer, Joseph Boyd, and gained possession of his service weapon. A struggle ensued between Carney and Pelletier, during which time Carney discharged Boyd's weapon into the air. Langston sought to assist Pelletier when Carney "attempted to train the weapon at her while pulling at the trigger." Langston, after taking cover, watched from a safe distance as Carney continued to struggle with Pelletier while Pelletier held Carney's hands and arms upward so that he was unable to use Boyd's weapon. Langston summoned additional police assistance, but became concerned when it appeared that Pelletier was losing ground in the struggle and there was a serious threat to officer safety. Langston fired a single fatal gunshot at Carney, striking him in the back of the head. Likewise, the internal affairs report refers to the fact that Langston was directed to receive counseling as a result of "off-duty conduct in Bridgeport" and that "[s]he does have several memoranda in her internal affairs files which were issued while she was in the training academy."

None of the facts surrounding Langston's role in Carney's death supports a reasonable inference that, at the time of the petitioner's criminal trial, she was living under a realistic or imminent threat of prosecution for her role in Carney's death. Moreover, the scant information in the report concerning counseling does not reasonably support an inference that, at the time of the petitioner's criminal trial, Langston's reputation in the police department was tarnished or that her job was in jeopardy. The further and critical inference on which the petitioner relies to demonstrate materiality is, as the court aptly characterized it, "outlandish . . . ." In an attempt to link the Carney shooting and the internal affairs report to the testimony at issue in this case, the petitioner argues that it would have been reasonable for the jury to infer that Langston had not merely a motive *to commit perjury* in an effort to convict an innocent person, but a motive *to fabricate evidence*, namely, the evidence that supported her corrected trial

testimony concerning the time at which she had been dispatched to meet with him. This reasoning strains credulity.

The petitioner also argues that a *Brady* violation occurred because the prosecutor failed to disclose that, at the time of the criminal trial, he asked Langston to obtain and produce evidence that contradicted her initial trial testimony.[9] Consistent with our previous analysis, even if we were to assume that, in this regard, the prosecutor suppressed evidence that was favorable to the defense, the petitioner has not demonstrated that this evidence was material. The materiality of this evidence is inextricably linked to the petitioner's theory that, because Langston either feared prosecution related to Carney's death or because she was concerned for her standing in the New Haven Police Department, Langston committed perjury and fabricated evidence in an attempt to lend support to the state's case and, thus, curry favor with the Office of the State's Attorney. As we have explained previously, the inferences on which this theory relies are not at all reasonable.

For the foregoing reasons, we are not persuaded that the resolution of the petitioner's *Brady* claim involves issues that are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions involved deserve encouragement to proceed further. Accordingly, we conclude that the petitioner has failed to demonstrate that the habeas court improperly denied his petition for certification to appeal with respect to this claim.

II

Next, the petitioner claims that the habeas court improperly denied his petition for certification to appeal with respect to his claim that counsel in a prior habeas action, Carpenter, deprived him of his right to the effective assistance of counsel by abandoning the claim that trial counsel, Dow, deprived him of his right to the effective assistance of counsel by failing to adequately examine, impeach, and challenge the testimony that Langston provided after she was recalled as a witness by the state.[10] We disagree with the petitioner.

As we discussed previously in this opinion, in count six of his third amended petition for a writ of habeas corpus, the petitioner claimed in relevant part that, in a prior habeas action, Carpenter rendered ineffective assistance in that she failed to plead, argue, and prove the claim set forth in count three of his petition. In claim three, the petitioner alleged that Dow had rendered ineffective assistance during the criminal trial by failing adequately to "cross-examine, impeach, or otherwise challenge the testimony of . . . Langston concerning the time she was dispatched to meet with the petitioner and her motivation to testify falsely against the petitioner . . . ."

In rejecting this aspect of the petitioner's claim of ineffective representation by Carpenter, the habeas court essentially determined that the petitioner could not prevail because there was no evidence that Dow performed deficiently as trial counsel. The court stated: "This court's review of the criminal trial transcripts demonstrates that Attorney Dow vigorously questioned Langston, whether to support her initial testimony or challenge her ensuing corrections, and the petitioner has not presented any evidence as to how Attorney Dow could have any better challenged Sergeant Langston on the dispatch times or her purported motivations for presenting false testimony."

Presently, the petitioner focuses on what he believes to be Carpenter's failure in the prior habeas action to substantiate adequately his claim that Dow's second cross-examination of Langston, after she was recalled as a witness by the state, was deficient. In his appellate brief, the petitioner argues that in the prior habeas action, Carpenter raised a claim concerning Dow's deficient performance as it related to his cross-examination of Langston and that Carpenter "was aware that the claim could be supported by impeachment evidence contained in Langston's internal affairs file." He argues that Carpenter's performance as habeas counsel "was deficient because she entirely failed to investigate the claim and abandoned it at the petitioner's habeas trial."[11]

Previously, we discussed Langston's initial trial testimony as well as her later trial testimony, which was presented after she was recalled as a witness by the state. The petitioner accurately observes that Langston's initial trial testimony tended to undermine the state's theory of the case and that her later testimony was unfavorable to the defense. He argues that Dow "did nothing to prepare to impeach [Langston's] later testimony. [Dow's] failure to prepare to do so was wholly deficient. There is a reasonable probability that—had [Dow] properly impeached Langston's recall testimony in a way that preserved the reliability of her initial testimony, the petitioner would have been acquitted." According to the petitioner, Dow was deficient for failing to learn of Langston's role in the shooting death of Carney in 1992 and her "internal affairs history," and that these failures prejudiced the petitioner because such facts would have supported his theory, which we explored in part I of this opinion, that Langston "had a motive to testify falsely against [him]." Once more, the petitioner asserts that it would have been reasonable for the jury to infer that Langston's "history of impropriety" motivated her to testify untruthfully in the state's favor in order to avoid prosecution for shooting Carney, to protect her standing in the police department generally, and to protect her job. The petitioner asserts that he was prejudiced by Dow's failure

because, had he challenged Langston in the manner described, he would have cast serious doubt on the credibility of her later testimony.

Moreover, the petitioner argues, Dow "failed to elicit testimony from Langston showing that she was aware that sources existed that could accurately state the time she was dispatched [to meet with the petitioner], but that she elected not to investigate or to obtain those in preparation for her recall testimony." Specifically, the petitioner argues that "Dow never inquired about Langston's reasons for believing that her notepad and police logbook were more accurate than her sworn police report. He also failed to inquire about whether other materials existed that would indicate the time she was dispatched to meet with petitioner, and whether she confirmed the accuracy of her notepad and police logbook with those materials."

With respect to these materials, the petitioner draws our attention to Langston's testimony at the habeas trial that computer generated dispatch records on the police department's computers as well as "reel-to-reel tapes" would have provided a record of the time at which she was dispatched to meet with the petitioner on May 6, 1993, and that such records were immune to human error. At the habeas trial, Langston testified, however, that she did not feel a need to refer to these records, but, in determining the accuracy of her later testimony, relied on her personal notebook and the police activity log. Although the petitioner refers to Langston's testimony in this regard, he does not refer to the content of these other materials, and it does not appear that they were part of the evidence presented at the habeas trial. Nonetheless, the petitioner argues that Dow prejudiced the petitioner by failing to explore this avenue of cross-examination because "had Dow . . . elicit[ed] the fact that she was aware of the computer generated dispatch records and reel-to-reel tapes, there is a reasonable probability that the jury would have acquitted the petitioner. Specifically, such testimony would have shown that both the prosecuting authority and Langston were aware that there was a record of the dispatch time that was not subject to human error, but that the prosecuting authority elected not to present that record to the jury. This would have raised reasonable questions as to why that evidence had not been presented and cast doubt on the reliability of Langston's recall testimony. There is a reasonable probability that the jury would have concluded that those records were not presented because they corroborated Langston's initial testimony that the petitioner was in the hospital at the time of the shooting and, accordingly, acquitted the petitioner." In this aspect of his claim, the petitioner argues that Dow was deficient simply for not drawing attention to the fact that the state failed to present these additional records, not that these additional records actually undermined the substance of Langston's later tes-

timony.

Before addressing the merits of the petitioner's claim, we set forth basic governing principles. "The use of a habeas petition to raise an ineffective assistance of habeas counsel claim, commonly referred to as a habeas on a habeas, was approved by our Supreme Court in *Lozada* v. *Warden*, 223 Conn. 834, 613 A.2d 818 (1992). In *Lozada*, the court determined that the statutory right to habeas counsel for indigent petitioners provided in General Statutes § 51-296 (a) includes an implied requirement that such counsel be effective, and it held that the appropriate vehicle to challenge the effectiveness of habeas counsel is through a habeas petition. . . . In *Lozada*, the court explained that [t]o succeed in his bid for a writ of habeas corpus, the petitioner must prove both (1) that his appointed habeas counsel was ineffective, and (2) that his trial counsel was ineffective. *Lozada* v. *Warden*, supra, 842. As to each of those inquiries, the petitioner is required to satisfy the familiar two-pronged test set forth in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. First, the [petitioner] must show that counsel's performance was deficient. . . . Second, the [petitioner] must show that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . *Lozada* v. *Warden*, supra, 842–43. In other words, a petitioner claiming ineffective assistance of habeas counsel on the basis of ineffective assistance of trial counsel must essentially satisfy *Strickland* twice . . . .

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . Judicial scrutiny of counsel's performance must be highly deferential and courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . . With respect to the prejudice prong, the petitioner must establish that if he had received effective representation by habeas counsel, there is a reasonable probability that the habeas court would have found that he was entitled to reversal of the conviction and a new trial . . . .

"It is well settled that in reviewing the denial of a

habeas petition alleging the ineffective assistance of counsel, [t]his court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Citations omitted; internal quotation marks omitted.) *Gerald W.* v. *Commissioner of Correction*, 169 Conn. App. 456, 463–65, 150 A.3d 729 (2016), cert. denied, 324 Conn. 908, 152 A.3d 1246 (2017). This court has described a petitioner's burden in this regard as a " 'herculean task.' " *Toccaline* v. *Commissioner of Correction*, 177 Conn. App. 480, 499, 172 A.3d 821, cert. denied, 327 Conn. 986, 175 A.3d 45 (2017).

The petitioner's claim that Carpenter's representation deprived him of his right to the effective assistance of counsel in that she failed to investigate and pursue the claim that Dow's cross-examination of Langston deprived the petitioner of his right to adequate representation at the criminal trial depends on his proving, under the principles enunciated in *Strickland*, that Dow performed deficiently and that his deficient representation was prejudicial. We need not consider whether Dow performed deficiently because the petitioner has failed to satisfy his burden of proving under *Strickland*'s second prong that Dow's performance prejudiced him.

To the extent that the petitioner's claim is based on Dow's failure to pursue cross-examination related to Langston's role in the shooting death of Carney in 1992 or to any of the information contained in the internal affairs report authored by Olson in 1992, the claim of prejudice is wholly unpersuasive. As we have discussed at length in part I of this opinion, the petitioner relies on facts that were not explored during Dow's cross-examination of Langston, including the fact that she fatally shot Carney in 1992 in the course of her duty as a police officer. Also, the internal affairs report that was filed following the shooting referred to the fact that she "[had] two previous internal affairs files, each involving off-duty conduct in Bridgeport"; several memoranda in her files were issued while she was in the training academy; and she had been directed to see a counselor. From these scant facts, the petitioner invites us to presume that a jury reasonably could have inferred that Langston had engaged in egregious wrongdoing such that she not only feared for her reputation and her career as a police officer, but that she feared prosecution. Furthermore, the petitioner invites us to presume that a jury reasonably could have inferred that, in an attempt to curry favor with the Office of the State's Attorney and to enhance her reputation as a police officer, Langston decided to correct her initial testimony, which was accurate, so that the state could successfully prosecute the petitioner for a crime that he did not commit. According to the petitioner, a jury reasonably could have inferred that this effort to assist the

state did not merely consist of Langston fabricating her testimony after she was recalled as a witness by the state, but her fabrication of evidence to support her testimony. The inferences on which the petitioner relies are unreasonable because they are not logically drawn from the facts in evidence.

To the extent that the petitioner's claim is based on Dow's failure to cross-examine Langston with respect to the fact that her recall testimony was based on her review of her personal notebook and police daily activity logs, but that she had not referred to additional resources including computer generated dispatch records and reel-to-reel tapes, the claim of prejudice is unsubstantiated. The petitioner relies on Langston's testimony that she did not deem it necessary to conduct further research into these additional resources as well as his belief that, unlike the documents on which Langston relied, these resources would have been immune to human error. The petitioner argues that if Dow had brought these facts to the jury's attention during his cross-examination of Langston, the jury surely would have found Langston's recall testimony to be untrue and that a finding of not guilty would have followed.

During her testimony at the habeas trial, Langston testified with respect to her belief that her police report was inaccurate because, therein, she had written as her dispatch time a time provided to her by the petitioner when she spoke with him at the hospital. She testified that her recall testimony was based on her personal notebook and the police activity log, which she believed to be accurate, and that she did believe it was necessary for her to refer to computer generated dispatch records in the custody of the police department. Langston did not appear to deflect the petitioner from conducting a further inquiry into the accuracy of her testimony. She testified that she believed that a record of her dispatch time was stored by the police department on "reel-to-reel tapes" and was "sure those tapes are still available." The petitioner has not presented any evidence to demonstrate that the computer generated records on which his claim heavily depends actually demonstrate that Langston's recall testimony, her personal notebook, or the police activity log were, in fact, inaccurate.

The evidence that is most damaging to the petitioner's claim of prejudice comes in the form of the petitioner's hospital records, which were introduced into evidence at his criminal trial and, thus, were fodder for the jury's consideration. It is undisputed that the hospital records reflect that, on May 6, 1993, emergency medical registration occurred at 2:49 a.m., an initial nursing assessment of the petitioner in the emergency department occurred at 2:55 a.m., the petitioner was examined by a doctor at 2:55 a.m., the petitioner was observed by a nurse at 3 a.m., and the petitioner was interviewed by the police at 3:05 a.m. The state's theory of the case was that the

shooting of the victim occurred in New Haven at 2:20 a.m. The habeas court found, and the petitioner does not dispute, that "Langston's corrected testimony was consistent not only with police department records, but also was corroborated by hospital records that showed the petitioner's admission time to be later than what was contained in Langston's report."[12]

The petitioner has failed to demonstrate that the alleged deficiencies in Dow's cross-examination of Langston prejudiced him. As the habeas court found, "Dow rigorously cross-examined [Langston] about her efforts to correct her testimony while also continuing to underscore the credibility of her initial testimony." We observe that not only did the petitioner's hospital records corroborate Langston's recall testimony, but the avenues of inquiry that the petitioner argues Dow should have pursued were not logically related to the evidence and the reasonable inferences to be drawn therefrom, and, thus, were not likely to have been persuasive to the jury. Because the petitioner has failed to prove that Dow's performance prejudiced him, he is likewise unable to demonstrate that, in the prior habeas action, Carpenter's failure to pursue the claim related to Dow's performance caused him prejudice.

For the foregoing reasons, we are not persuaded that the resolution of the petitioner's claim concerning ineffective representation by Carpenter involves issues that are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions involved are adequate to deserve encouragement to proceed further. Accordingly, the petitioner has failed to demonstrate that the court abused its discretion in denying the petition for certification to appeal with respect to this claim.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] In his direct appeal, the petitioner claimed: "(1) except for the larceny charges, there was insufficient evidence to establish his guilt beyond a reasonable doubt with respect to the other crimes, (2) he was denied his right to confront his accusers and (3) the trial court gave incorrect jury instructions concerning proof beyond a reasonable doubt and consciousness of guilt." *State* v. *Ham*, supra, 55 Conn. App. 283.

[2] The petitioner alleged in relevant part that, prior to filing the present petition for a writ of habeas corpus, he filed seven other petitions for a writ of habeas corpus. The petitioner alleged that, in 2001, he withdrew the first petition, brought under docket number CV-01-0341487, without prejudice.

He alleged that, in 2002, the habeas court, *Carroll, J.*, dismissed the second petition that he brought under docket number CV-02-0344847.

He alleged that, in 2002, the habeas court, *Carroll, J.*, dismissed the third petition that he brought under docket number CV-02-0345701.

He alleged that, in 2003, the habeas court, *White, J.*, dismissed the fourth petition that he brought under docket number CV-02-0349430.

He alleged that, in 2004, the habeas court, *White, J.*, dismissed the fifth petition, which had not been assigned a docket number.

He alleged that, in 2008, following a trial, the habeas court, *dos Santos, J.*, denied the sixth petition, which was brought under docket number CV-05-4000598. In this action, the petitioner was represented by Attorney Frank Cannatelli. Subsequently, our Supreme Court affirmed the judgment of the habeas court. *Ham* v. *Commissioner of Correction*, 301 Conn. 697, 23 A.3d 682 (2011).

The petitioner further alleged that, in 2012, following a trial, the habeas court, *Newson, J.*, denied his seventh petition for a writ of habeas corpus that was brought under docket number CV-09-4003016. In this action, the petitioner was represented by Attorney Hilary Carpenter. Subsequently, this court affirmed the judgment of the habeas court. *Ham* v. *Commissioner of Correction*, 152 Conn. App. 212, 98 A.3d 81, cert. denied, 314 Conn. 932, 102 A.3d 83 (2014).

[3] The petitioner alleges a violation of his right to due process under the federal and state constitutions. Because the petitioner has not provided this court with an independent analysis of his claim under the state constitution, we deem his state constitutional claim to be abandoned and limit our analysis to the federal constitution. See *State* v. *Hearl*, 182 Conn. App. 237, 271 n.28, 190 A.3d 42, cert. denied, 330 Conn. 903, 192 A.3d 425 (2018).

[4] The court observed that there was evidence that Langston had two previous internal affairs files, each involving off-duty conduct in Bridgeport, but that there was no evidence that Langston was aware of these files. Additionally, the court observed that there was evidence that Langston had "several memoranda in her internal affairs files which were issued while she was in the training academy." See footnote 6 of this opinion.

[5] The court credited Langston's testimony that she retired on June 30, 2011.

[6] The internal affairs report was introduced into evidence at the habeas trial. The lengthy report, prepared by Olson, addressed to the chief of the New Haven Police Department, and dated March 13, 1992, detailed the activities of Langston and two other police officers in the shooting death of Carney on January 6, 1992. The report detailed, among other things, a physical struggle between Carney and three police officers, including Langston, following a complaint of criminal trespass. During this struggle, Carney gained possession of one of the officer's pistols and caused it to discharge. After Langston attempted to restrain Carney, Carney attempted to point the weapon at Langston while pulling at the trigger. After she took cover, Langston observed that Carney was gaining the upper hand in his struggle with one of the officers. She discharged her service weapon once, fatally shooting Carney. The report does not conclude that Langston's conduct in this incident was improper in any way.

The report also includes the following: "Officer Diane Langston was employed by this department on July 31, 1989. She has two previous internal affairs files, each involving off-duty conduct in Bridgeport. One of the files was turned over to Major Thomas Muller and the second resulted in you causing her to . . . [obtain counseling]. She does have several memoranda in her internal affairs files which were issued while she was in the training academy. These memoranda and the latter incident in Bridgeport were the reason she was directed by you to see [a counselor]."

[7] The petitioner argues, as well, that, during the habeas trial, Langston was less than forthcoming about whether she had an "internal affairs history" and that she falsely testified at the habeas trial that she had not been asked to see a counselor as a result of her off-duty conduct. Accordingly, the petitioner argues that, had Langston testified in a similar manner at his criminal trial, he would have had the ability to challenge her credibility by means of the internal affairs report. This aspect of the claim, which is based merely on speculation as to how Langston might have testified at the criminal trial, is not persuasive.

[8] As we explain in greater detail in part II of this opinion, the state presented hospital records that corroborated Langston's testimony that, after the police were notified that the petitioner had been shot, she had been dispatched to meet with the petitioner at the hospital after 2:20 a.m.

[9] As part of this claim, the petitioner challenges the habeas court's finding that he "presented no credible evidence that the prosecutor asked Langston to obtain and produce evidence contradicting her initial testimony" at the petitioner's criminal trial. The petitioner accurately refers to the fact that he presented evidence that, at a prior habeas trial, the prosecutor acknowledged that, prior to Langston's subsequent testimony on April 13, 1997, he had "requested . . . Langston to conduct some investigation to see whether . . . information [concerning the fact that her initial trial testimony was inaccurate] would be available and [whether that information was] something I would be able to put before the jury." When he was presented with this testimony during the present habeas trial, the prosecutor stated that although it did not refresh his recollection of the relevant events, on the basis of his prior testimony he agreed with the respondent's counsel when she asked him if he would "accept" that the version of events described in his prior testimony was accurate.

The petitioner argues that the habeas court "apparently overlooked" this testimony of the prosecutor and that, on the basis of this testimony, this court should be left with the definite and firm conviction that the habeas court's factual finding is clearly erroneous. In light of our conclusion that the evidence at issue was not material for purposes of *Brady*, we conclude that any error in the court's factual finding was harmless.

[10] Although the petitioner claims that he was deprived of his right to the effective assistance of prior habeas counsel under the federal and state constitutions, he has not provided this court with an independent analysis of his claim under the state constitution. Accordingly, we deem his claim under the state constitution to be abandoned and limit our review to the federal constitution. See *State* v. *Hearl*, supra, 182 Conn. App. 271 n.28.

[11] At the present habeas trial, Carpenter acknowledged that she "abandoned" the claim related to Dow's cross-examination of Langston.

[12] Rather than challenging the accuracy of the hospital records, the petitioner argues that, in evaluating prejudice, this court should discount the importance of the records because, during its deliberations, the jury requested to rehear Langston's testimony in its entirety. From this fact, the petitioner argues that this court must conclude that Langston's testimony was "among the most important parts of the case." There is absolutely no indication in the trial court record with respect to why the jury wanted to rehear Langston's testimony, nor any reason to infer that, in resolving the factual issues in this case, the jury improperly focused solely on Langston's testimony rather than the evidence in its entirety. The petitioner has not referred this court to any relevant authority to support the proposition that, in our evaluation of whether Carpenter's representation caused him prejudice, we should not consider all of the matters in the trial court record that are relevant to an evaluation of Dow's performance and the prejudice, if any, that it caused the petitioner. The fact that the jury asked to rehear the entirety of Langston's testimony does not in any way undermine the significance of the hospital records in our evaluation of prejudice.

--------------------------------