******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOHNNY DUPIGNEY *v.* COMMISSIONER
OF CORRECTION
(AC 39519)

DiPentima, C. J., and Elgo and Pellegrino, Js.

*Syllabus*

The petitioner, who had been convicted of the crimes of murder, carrying
a pistol without a permit and criminal possession of a pistol or revolver
in connection with the shooting death of the victim, sought a writ of
habeas corpus. He claimed, inter alia, that his trial counsel had provided
ineffective assistance by failing to prepare adequately for trial by not
visiting the crime scene in person and not preparing O, an investigator
for the defense, for trial, and that had counsel prepared adequately, the
credibility of an eyewitness, D, could have been undermined. At the
petitioner's criminal trial, the state had presented the testimony of three
eyewitnesses, D, W and P, who all identified the petitioner as the shooter.
The habeas court rendered judgment denying the habeas petition, con-
cluding that the petitioner was not prejudice by his trial counsel's alleged
deficient performance because he failed to prove, by a preponderance
of the evidence, that there existed a reasonable probability that, but for
his trial counsel's alleged unprofessional errors, the result of the trial
would have been different. In reaching its decision, the court emphasized
the importance of P's testimony at the criminal trial, stating that none
of the petitioner's allegations of deficient performance diminished the
devastating impact of P's recitation of the events and largely untarnished
identification of the petitioner as the victim's shooter. Thereafter, on
the granting of certification, the petitioner appealed to this court. *Held*
that the habeas court properly concluded that the petitioner was not
prejudiced by his trial counsel's performance, as there was not a reason-
able probability that the alleged inadequate preparation by trial counsel
would have altered the jury's verdict; the petitioner failed to satisfy his
burden of showing that the result of the trial would have been different
if his trial counsel had prepared for trial by visiting the crime scene and
instructing O to take certain photographs of the scene that could have
called into question D's version of events, thereby undermining his
credibility, as the petitioner failed to demonstrate how doing so would
have created a substantial likelihood that the result would have been
different, particularly in light of the fact that state's evidence against
the petitioner was strong and the jury heard testimony from two corrobo-
rating witness, P and W, which was unaffected by the petitioner's appeal.

Argued May 24—officially released July 31, 2018

*Procedural History*

Amended petition for a writ of habeas corpus,
brought to the Superior Court in the judicial district of
Tolland and tried to the court, *Sferrazza, J.*; judgment
denying the petition, from which the petitioner, on the
granting of certification, appealed to this court.
*Affirmed.*

*Megan L. Wade*, assigned counsel, with whom were
*Emily Graner Sexton*, assigned counsel, and, on the
brief, *James P. Sexton*, assigned counsel, for the appel-
lant (petitioner).

*Kathryn W. Bare*, assistant state's attorney, with
whom, on the brief, were *Patrick Griffin*, state's attor-
ney, and *Rebecca Barry*, assistant state's attorney, for
the appellee (respondent).

*Opinion*

ELGO, J. The petitioner, Johnny Dupigney, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. In this certified appeal, the petitioner claims that the habeas court improperly rejected his claim of ineffective assistance of counsel. We affirm the judgment of the habeas court.

The following facts and procedural history are relevant to our resolution of the petitioner's appeal. "Morris Lewis, the victim, and Herbert Dupigney, the [petitioner's] brother, were partners in an illegal drug selling enterprise in New Haven. The drug sales were conducted primarily at 304 Winthrop Avenue. Other members of the operation included Nick Padmore, an individual known to the [witnesses] in the trial only as 'Ebony' and Eric Raven. In December, 1994, following the victim's incarceration, the [petitioner] moved from Boston to New Haven to assist his brother in the drug operation. The [petitioner] also enlisted an acquaintance from Boston, Derrick D'Abreau, to help with the drug sales. D'Abreau moved to New Haven in the beginning of January, 1995.

"The victim was released from jail on January 23, 1995. That day, the victim telephoned Herbert Dupigney at the home of Carlotta [Grinnan]. [Grinnan] overheard the [petitioner] tell his brother that the victim 'was not going to get a . . . thing.'

"On January 24, 1995, at about 9:30 p.m., the victim met with the [petitioner], the [petitioner's] brother, Herbert Dupigney, D'Abreau, Padmore, Raven and 'Ebony' at 304 Winthrop Avenue. Upon his arrival at the building, the victim told everybody to leave because that was his location to sell drugs. As the argument escalated, the victim slapped the [petitioner] and threw a chair at him. The victim then broke a bottle and attempted to attack the [petitioner]. D'Abreau and Raven retreated to a turquoise Dodge Neon. The victim then started swiping the bottle at the occupants of the vehicle through one of its open windows. While Herbert Dupigney attempted to calm the victim and get him away from the car, the [petitioner] inquired if anybody had a gun. In response, D'Abreau gave the [petitioner] a .380 caliber pistol. The [petitioner] then pointed the gun at the victim and told him to back off.

"Herbert Dupigney and the [petitioner] then entered the turquoise Dodge Neon and left the scene. The group proceeded to [Raven's] apartment at 202 Sherman Avenue. The [petitioner] was visibly upset, and stated that the victim was getting on his nerves and that he was going to kill him. After a few minutes, the [petitioner] and his brother left.

"The [petitioner] and his brother rejoined [Raven] and D'Abreau at 202 Sherman Avenue approximately

one hour later. Between 11:15 p.m. and 11:30 p.m., all four individuals proceeded to 300 Winthrop Avenue, where the drug operation had rented a fourth floor room facing Winthrop Avenue. At that time, the victim was playing dice with Padmore and 'Ebony' in front of 304 Winthrop Avenue. Herbert Dupigney went down to the street to try to smooth things over with the victim. It was understood that if the attempt at reconciliation was unsuccessful, then the victim would be shot. The [petitioner], [Raven] and D'Abreau observed the scene from the apartment's window. After a few minutes of conversation between the parties and with no overt indication that an accord had been reached, the victim, Padmore and 'Ebony' walked off in the direction of Edgewood Avenue. Herbert Dupigney called out to 'Ebony.' After 'Ebony' started to return, the [petitioner] and [Raven] abruptly left the apartment.

"As the victim and Padmore approached the corner of Winthrop Avenue and Edgewood Avenue, the turquoise Dodge Neon approached them. The [petitioner] exited the vehicle and fired several shots at the victim. A brief struggle ensued, after which the [petitioner] fired more shots at the victim. The victim died of his wounds shortly thereafter." *State* v. *Dupigney*, 78 Conn. App. 111, 112–14, 826 A.2d 241, cert. denied, 266 Conn. 919, 837 A.2d 801 (2003).

At the petitioner's criminal trial, the state presented the testimony of three eyewitnesses: D'Abreau, Aisha Wilson, and Padmore. "D'Abreau testified that he was an eyewitness to the murder. He observed the shooting from the fourth floor windows of the apartment building at 300 Winthrop [Avenue] and was able to identify the [petitioner] as the assailant on the basis of the clothing that the [petitioner] was wearing at the time of the murder. In addition to his personal observation, D'Abreau testified that the dispute over drug dealing had been discussed previously and that if the disagreements could not be resolved, the [petitioner] was going to shoot the victim." Id., 121.

In her testimony, "Wilson identified the [petitioner] as the one who had argued with and later shot the victim. On direct examination, Wilson testified that at approximately 9:30 on the evening of January 24, 1995, she witnessed the victim and three other people engaged in an argument outside her building. Wilson was able to identify two of these people as Herbert Dupigney and an individual known to her only as 'Ebony.' . . . Her aunt told her that the third individual was Herbert Dupigney's brother.

"The victim was yelling at the [petitioner], 'Just shoot me, just shoot me.' As the argument progressed, the victim broke a bottle and kicked over a chair. The victim then went after the [petitioner] with the broken bottle. Thereafter, the [petitioner] and his brother entered a turquoise colored car, while 'Ebony' remained behind

trying to calm the victim.

"Later that same evening, at approximately 11:15 p.m., Wilson heard someone outside her apartment yelling, 'Help, help. Fire, fire.' When she looked out of the window, she saw the victim bleeding and walking in the middle of the street. That same turquoise colored car in which the [petitioner] and his brother previously had departed then returned. The individual that had been identified as Herbert Dupigney's brother, and whom she identified as the [petitioner], exited the car and shot the victim." Id., 115–16.

"Padmore contacted the New Haven police shortly after the murder, claiming to have information regarding the crime. The police interviewed him on February 1, 1995. At that time, he provided the police with a taped statement identifying the [petitioner] as the assailant. He also identified the [petitioner] as the shooter from a photographic array and signed the [petitioner's] photograph. Both the taped statement and the photograph were admitted into evidence under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986)." (Footnote omitted.) Id., 120–21.

"The [petitioner] was charged with one count of murder in violation of [General Statutes] § 53a-54a, one count of carrying a pistol without a permit in violation of [General Statutes] § 29-35 and one count of criminal possession of a pistol or revolver in violation of [General Statutes] § 53a-217c. . . . All of the counts were tried concurrently.[1] On March 31, 2000, the [petitioner] was found guilty on all three counts and later was sentenced to a total effective sentence of seventy years incarceration." (Footnote added.) Id., 114–15. The petitioner's conviction was affirmed on direct appeal. Id., 125.

Following two unsuccessful actions that concerned DNA evidence; see *State* v. *Dupigney*, 309 Conn. 567, 586, 72 A.3d 1009 (2013); *State* v. *Dupigney*, 295 Conn. 50, 74, 988 A.2d 851 (2010); the petitioner commenced the present habeas action. His February 8, 2016 amended petition for a writ of habeas corpus contained eight counts alleging, in relevant part, ineffective assistance of trial counsel.

Following a trial, the habeas court denied the amended petition for a writ of habeas corpus. In its memorandum of decision, the court disposed of the ineffective assistance of trial counsel claim relevant to this appeal under the prejudice prong of *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), concluding that the petitioner had "failed to prove, by a preponderance of the evidence, that there exists a reasonable likelihood that, but for the professional representation alleged, the outcome of the petitioner's criminal trial would have been different." The court subsequently granted the petition for certification

to appeal, and this appeal followed.[2] In this appeal, the sole issue is whether the petitioner was denied his constitutional right to the effective assistance of trial counsel.[3]

As a preliminary matter, we set forth the standard of review and relevant principles of law that govern our analysis of the petitioner's appeal. "It is well established that [t]he habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas [court], as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 40–41,    A.3d    (2018).

"To determine whether a [petitioner] is entitled to a new trial due to a breakdown in the adversarial process caused by counsel's inadequate representation, we apply the familiar two part test adopted by the court in *Strickland*. A [petitioner's] claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the [petitioner] must show that counsel's performance was deficient. This requires [a] showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the [petitioner] by the [s]ixth [a]mendment. Second, the [petitioner] must show that the deficient performance prejudiced [him]. This requires [a] showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." (Internal quotation marks omitted.) Id., 30.

"When defense counsel's performance fails the [first prong of *Strickland*], a new trial is required if there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The question, therefore, is whether there is a reasonable probability that, absent the errors, the [fact finder] would have had a reasonable doubt respecting guilt. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Citations omitted; internal quotation marks omitted.) Id., 38.

"In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . .    Instead, *Strickland* asks whether it is reasonably likely the result would have been different. . . . The likelihood of a different result must be substantial, not just conceiv-

able." (Internal quotation marks omitted.) Id., 40.

We do not address the performance prong of *Strickland* on appeal because the habeas court did not address the performance of the petitioner's counsel, nor was the habeas court required to do so. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [petitioner] as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffective claim on the ground of lack of sufficient prejudice . . . that course should be followed." (Internal quotation marks omitted.) *Mahon* v. *Commissioner of Correction*, 157 Conn. App. 246, 247–48 n.1, 116 A.3d 331, cert. denied, 317 Conn. 917, 117 A.3d 855 (2015).

On appeal, the petitioner contends that the habeas court improperly concluded that his trial counsel's performance did not prejudice him. He claims that his trial counsel was ineffective in failing to prepare adequately for trial by (1) not visiting the crime scene or investigating the crime scene in person[4] and (2) not preparing the defense's investigator, Michael O'Donnell, for trial. Specifically, the petitioner argues that, had his trial counsel visited the crime scene, he would have been able to instruct O'Donnell to take photographs to demonstrate "that D'Abreau could not possibly have seen the murder from the fourth floor apartment as he claimed . . . ."[5] He also argues that had trial counsel properly examined O'Donnell, he would have further undermined D'Abreau's credibility "by challenging D'Abreau's version of events." Finally, the petitioner argues that had trial counsel properly prepared O'Donnell for cross-examination, O'Donnell "would have come across as a more credible witness."

The crux of the petitioner's argument is that he was prejudiced by his trial counsel's performance because, had his trial counsel adequately prepared for trial, D'Abreau's credibility "could have been diminished, and had the jury not credited D'Abreau's testimony, the state's case would have been exceedingly weak." The respondent, the Commissioner of Correction, argues that the habeas court correctly concluded that trial counsel's alleged errors "were inconsequential to the verdict because the state's case against the petitioner was overwhelming." We agree with the respondent.

In its memorandum of decision, the habeas court emphasized the importance of Padmore's testimony at the underlying criminal trial. It stated: "Because of Padmore's largely untarnished identification of the petitioner as the victim's assailant and the blue Neon as the vehicle from which that assailant exited and the antagonism between the victim and the Dupigneys over drug turf, there is no reasonable probability that the alleged deficiencies by [trial counsel] affected the jury's verdict in this case. The conjunction of that evidence with the confirmatory testimony of Wilson and

D'Abreau was helpful to proving the petitioner's guilt beyond a reasonable doubt but not essential to that end. Instead, it was Padmore's statement that endowed the testimony of Wilson and D'Abreau with credence." The court concluded that "[n]one of the petitioner's allegations of poor representation by [trial counsel] diminish the devastating impact of Padmore's recitation of events."

We conclude that the petitioner has not satisfied his burden of showing a reasonable probability that had trial counsel prepared for trial by visiting the crime scene or preparing O'Donnell, the jury would have had a reasonable doubt with respect to the petitioner's guilt. The petitioner fails to show how undermining the credibility of one particular witness, D'Abreau, would have made it reasonably likely that the result would have been different.

"[T]he strength of the state's case is a significant factor in determining whether an alleged error caused prejudice to the petitioner." *Griffin* v. *Commissioner of Correction*, 98 Conn. App. 361, 367, 909 A.2d 60 (2006). Our Supreme Court, in its decision denying a prior action brought by the petitioner regarding DNA evidence, noted that there was "strong evidence . . . identifying the petitioner as the shooter." *State* v. *Dupigney*, supra, 295 Conn. 72. Further, in its decision denying the petitioner's second action regarding DNA evidence, our Supreme Court stated that its previous characterization of the state's evidence against the petitioner as " 'strong' . . . may have been an understatement." (Citation omitted.) *State* v. *Dupigney*, supra, 309 Conn. 584.

The petitioner relies on *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 51 A.3d 948 (2012), and *Dieudonne* v. *Commissioner of Correction*, 141 Conn. App. 151, 60 A.3d 385 (2013), appeal dismissed, 316 Conn. 474, 112 A.3d 157 (2015), to support the proposition that a failure to investigate that results in the state's evidence being left *largely uncontested* is prejudicial when it leaves the jury without a plausible alternative to the state's witnesses' descriptions of the events. The petitioner's reliance on these cases is misplaced. In *Gaines*, trial counsel's failure to investigate deprived the petitioner of an alibi witness. *Gaines* v. *Commissioner of Correction*, supra, 692. In *Dieudonne*, trial counsel failed to investigate and call an eyewitness who corroborated the petitioner's version of events. *Dieudonne* v. *Commissioner of Correction*, supra, 162. In the present case, however, the petitioner is contending that his trial counsel's failure to investigate led to the deficient preparation of O'Donnell, who was not a witness to the events. He argues that proper investigation and preparation of O'Donnell would not have left D'Abreau's eyewitness testimony largely unchallenged. We disagree.

First, D'Abreau's testimony was not left uncontested at trial. Trial counsel elicited evidence that D'Abreau had received a grant of immunity from the state in exchange for his testimony, that he was a convicted felon, and that he had initially lied to the police about his whereabouts during the murder. D'Abreau testified that he witnessed both the first shooting and the second shooting. Although the petitioner argues that D'Abreau could not have physically observed the first shooting, it is not contested that D'Abreau physically could have witnessed the second shooting. Furthermore, trial counsel did bring evidence before the jury that it was physically impossible for D'Abreau to have witnessed the first shooting.[6]

Second, the petitioner fails to show how the jury would have had a plausible alternative to D'Abreau's description of the events but for trial counsel's performance. Even if trial counsel had been able to undermine the credibility of D'Abreau's testimony regarding his observance of the first shooting, and even if that led the jury to put less weight on D'Abreau's testimony regarding his observance of the second shooting, the jury also heard the testimony of two corroborating witnesses that together accounted for both shootings.[7] As the habeas court succinctly concluded: "D'Abreau supplemented Padmore's recollection by testifying that the Dupigneys coordinated the killing of the victim beforehand and confirmed Padmore's version of the initial attack by the petitioner [where the petitioner fired the first series of gunshots at the victim]. . . . Wilson, a neutral witness, corroborated D'Abreau's statements regarding the second series of shots fired by the petitioner at the victim."

We reiterate that, under the prejudice prong of *Strickland*, "[t]he likelihood of a different result must be *substantial*, not just conceivable." (Emphasis added; internal quotation marks omitted.) *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 40. Calling into question D'Abreau's version of events does not create a substantial likelihood that the result would have been different. It is unlikely that any additional preparation by trial counsel would have swayed the jury to disbelieve the whole of D'Abreau's testimony, *in addition to* the testimony of Wilson and Padmore, which is unaffected by the petitioner's appeal.

We conclude that there is not a reasonable probability that the claimed inadequate preparation by trial counsel would have altered the jury's verdict; the petitioner has failed to undermine our confidence in the outcome. Accordingly, the habeas court properly concluded that the petitioner was not prejudiced by his trial counsel's performance.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] "The [petitioner] pleaded not guilty to all three counts and elected to be tried to the jury on the charges of murder and carrying a pistol without a permit, and to the court on the remaining charge." *State* v. *Dupigney*, supra, 78 Conn. App. 114.

[2] On June 2, 2017, the petitioner filed a motion for articulation with the habeas court, in which he asked the court "to articulate the factual and legal grounds for denying the petitioner's claims in [various subsections of the ineffective assistance of trial counsel claim] of the petition." By order dated June 7, 2017, the habeas court granted the request in part and further articulated one subsection of the ineffective assistance of trial counsel claim not relevant on appeal. On June 22, 2017, the petitioner filed a motion for review with this court, in which he sought further articulation. By order dated July 26, 2017, this court granted review but denied the relief requested.

[3] In his amended petition for a writ of habeas corpus, the petitioner raised sixteen subsections to his ineffective assistance of trial counsel claim. On appeal, the petitioner raises only one such claim, which relates to his trial counsel's investigation of the case and preparation of defense investigator Michael O'Donnell.

[4] On appeal, the respondent, the Commissioner of Correction, argues that the petitioner cannot prevail in his claim based on his trial counsel's failure to visit the crime scene because it was not properly pleaded before the habeas court and the habeas court did not rule on the issue, making it unreviewable by this court. We need not address the merits of this contention in light of our conclusion that the petitioner fails to satisfy the prejudice prong of *Strickland*.

[5] At trial, O'Donnell testified that he was not able to see the location of the first shooting from any window within the fourth floor apartment. O'Donnell, however, did not present any photographs of the view from the apartment windows in addition to his testimony.

Furthermore, as we discuss subsequently in this opinion, although the petitioner argues that D'Abreau could not have observed the first shooting, he does not contend that D'Abreau could not have possibly observed the second shooting.

[6] The petitioner, through O'Donnell's testimony, did present evidence to contradict D'Abreau's testimony regarding his observance of the first shooting. See footnote 5 of this opinion.

[7] The petitioner argues that there were "significant flaws" in Wilson's testimony, but these issues were properly before the jury. As this court noted in the petitioner's direct appeal: "Wilson . . . testified on cross-examination that she could not see the shooter's face from the apartment. She stated, however, that the shooter was wearing the same clothing as she had seen 'Herbie's brother' wearing and that he arrived in the same car in which the [petitioner] had departed earlier that evening. On redirect examination, Wilson then testified that she and her aunt had witnessed the shooting and the events leading to it from the window of that apartment in which they lived. Wilson testified that her aunt identified the shooter as Herbie's brother." *State* v. *Dupigney*, supra, 78 Conn. App. 116.

The petitioner also argues that there were "glaring deficiencies" to Padmore's testimony, but these too were properly before the jury. As noted previously in this opinion, Padmore's taped statement and the photograph he signed identifying the petitioner as the assailant were admitted as evidence at trial. *State* v. *Dupigney*, supra, 78 Conn. App. 120–21. As this court noted in the petitioner's direct appeal: "At trial, Padmore claimed to have been under the influence of illegal drugs while at the New Haven police station and denied any memory of either providing the statement to the police or choosing the [petitioner's] photograph from the array. The police detective who interviewed Padmore at the station testified that he appeared clear-headed and sober while at the station." Id., 121 n.3.