******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

LAWRENCE ANDREWS *v.* COMMISSIONER
OF CORRECTION
(AC 41689)

DiPentima, C. J., and Keller and Moll, Js.

*Syllabus*

The petitioner, who previously had been convicted of felony murder in connection with the death of the victim, who died of asphyxia by manual strangulation and had been found in the basement of an apartment building, filed a second amended petition for a writ of habeas corpus, claiming, inter alia, that he received ineffective assistance from the counsel who had represented him with respect to his criminal trial. Specifically, he claimed that his trial counsel was ineffective in failing to investigate and call R as a witness at the criminal trial, and to present a defense predicated on R's testimony and a written statement R had provided to the police, in which R stated that S had confessed to killing the victim. The habeas court rendered judgment denying the habeas petition and, thereafter, denied the petition for certification to appeal, and the petitioner appealed to this court. *Held* that the habeas court did not abuse its discretion in denying the petition for certification to appeal, as the petitioner failed to demonstrate that his claims of ineffective assistance of counsel were debatable among jurists of reason, that a court could have resolved the issues in a different manner, or that the questions raised were adequate to deserve encouragement to proceed further: the habeas court's findings that S's confession to R, which trial counsel did not present to the jury at the petitioner's criminal trial, did not exclude the presence of others in the basement at the time of the victim's murder and that R assumed that the petitioner was not with S when S murdered the victim were not clearly erroneous, as the evidence in the record did not indicate that S told R that the petitioner was not present when S murdered the victim, R's testimony and statement indicated only that S killed the victim, and the evidence supported the court's findings that S's confession did not exclude the presence of others at the crime scene when S murdered the victim and that R merely presumed that the petitioner was absent; moreover, the petitioner failed to demonstrate that he was prejudiced by his trial counsel's alleged deficient performance because, even if S's confession to R had been presented to the jury at the petitioner's criminal trial, there was no reasonable probability that the outcome of the trial would have been different.

Argued September 9—officially released November 5, 2019

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Sferrazza, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed.*

*Patrick S. White*, assigned counsel, with whom, on the brief, was Christopher Y. Duby, assigned counsel, for the appellant (petitioner).

*Timothy J. Sugrue*, assistant state's attorney, with whom on the brief, were *Maureen Platt*, state's attorney, and *Marc G. Ramia*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

MOLL, J. The petitioner, Lawrence Andrews, appeals from the denial of his second amended petition for a writ of habeas corpus following the denial of his petition for certification to appeal. On appeal, the petitioner claims that the habeas court (1) abused its discretion in denying his petition for certification to appeal and (2) erroneously concluded that he failed to establish that his state and federal constitutional rights to the effective assistance of counsel were violated.[1] We conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal and, accordingly, dismiss the appeal.

The following facts, as set forth by our Supreme Court in the petitioner's direct appeal from his conviction and as recited by the habeas court in its memorandum of decision, and procedural history are relevant to our disposition of the appeal. "On March 21, 1999, a tenant at 17 Burton Street in the city of Waterbury went to the basement to retrieve his bicycle and discovered the partially clothed body of the victim, Michelle McMaster, lying on the floor. A police investigation subsequently determined that the cause of her death was asphyxia by manual strangulation and that the evidence also was consistent with a sexual assault.

"For nearly one decade, the police were unable to solve the crime. In 2008 and 2009, however, a purported eyewitness, Donna Russell, was interviewed on several occasions by detectives from the Waterbury Police Department and gave three increasingly detailed written statements regarding what she had seen. In her statements, Russell disclosed that, on the evening of March 20, 1999, she went to the basement of 17 Burton Street, a local drug hangout, for the purpose of using heroin. Upon her arrival, four other people already were there: the [petitioner], Barry Smith, a man she did not know but who later was identified from a photographic array as Orenthain Daniel, and the victim. As Russell proceeded to inject herself with heroin, she heard the [petitioner] and the victim arguing about money or drugs. The argument quickly escalated, and a struggle ensued, during which the victim was knocked down. Afraid that something 'horrible' was about to happen, Russell decided to flee. The last thing she saw upon escaping from the basement was the [petitioner] bending over the victim and choking her, Smith holding down her arms, and Daniel pulling down her pants. She also heard the victim gasping for air and pleading for Russell's help, and the men saying they were going to have sex with her one way or another." *State* v. *Andrews*, 313 Conn. 266, 270–71, 96 A.3d 1199 (2014).

Our Supreme Court in *Andrews* also set forth the following additional facts. On March 6, 2009, the petitioner was arrested and charged with murder. Id., 271

and n.2. "On March 7, 2009, the day after the [petitioner] was arrested and charged with murder, he gave oral and written statements to the police regarding his involvement in the crime. In his statements, the [petitioner] explained that, in 1999, he was a 'runner' who referred drug purchasers to drug sellers and received drugs in exchange for the referrals. In March, 1999, he brought the victim to a drug seller for a $100 purchase of crack cocaine and received $30 worth of crack cocaine in return. He and the victim then went to the basement of a house on Burton Street 'where lots of people go to get high.' Smith, who also was in the basement, began to argue with the victim about giving him some of her crack cocaine. Smith then hit the victim in her face, which caused her to fall down. Believing that the crack cocaine was in one of the victim's hands, which was clenched, and knowing that she had a fairly large quantity of the substance, the [petitioner] explained in his signed, written statement: 'I thought to myself, why should [Smith] get all the crack? . . . I want to get some for myself, so I went at [the victim]. [The victim] was trying to wrestle out from under [Smith], so I went up to the top of her head and tried to control her head and get the crack. It was a frenzy. I grabbed her by the neck and, at one point to control her, I hit her in the head a couple [of] times. When I had her by the neck, I was squeezing her neck, trying to knock the wind out of her. After I had her by the neck, my hands were mostly on her chest and shoulders, but I did grab her neck a couple more times. Then [Smith] started to choke her, and she started to go out, by that, I mean, pass out. Then another guy jumped [in], and he hit her in the stomach. At one point, [Smith] got a metal thing. It was like some frame of a table or chair and [he] started to swing at [the victim]. It hit both me and her. All the while, [Smith] was still choking her. I was trying to grab at her hand to get the crack, but she wouldn't let go. When this was all going on, I remember seeing [Russell] . . . . I'm not sure when [Russell] left. The third guy started to pull [the victim's] pants down and then [Smith] pulled up her shirt; this is when [the victim] let go of the crack, when she tried to hold her pants so they wouldn't get down. [Smith] started to choke her again, and, eventually, she went out. When I mean she went out, her eyes were closed, she wasn't fighting no more. I don't know if she was dead or not, but she wasn't moving. I don't even know if she was breathing. The third guy was still pulling her pants down. I knew this was bad, so I got up and got out of there. I don't know what happened to the crack. I'm sure someone tried to get it off the floor.' The [petitioner] later identified Smith and Daniel from photographic arrays as the other two participants in the incident." Id., 311–13.

By way of its operative substitute information filed on April 27, 2011, the state charged the petitioner with

murder in violation of General Statutes §§ 53a-8 and 53a-54a (a), and felony murder, based on the predicate felony of attempted robbery, in violation of General Statutes § 53a-54c.[2] The case was tried to a jury over the course of approximately two weeks in May and June, 2011. The petitioner, who was represented by Attorney Eroll Skyers, testified at trial. The petitioner's theory of defense was that he was not present at the Burton Street residence on the night of the victim's murder, he had not seen the victim for a couple of years prior to 1999, and his statement to the police following his arrest had been the product of deception. Following trial, the jury acquitted the petitioner of murder, but convicted him of felony murder. Subsequently, the trial court sentenced the petitioner to thirty-five years of incarceration. The petitioner appealed to our Supreme Court, which affirmed the judgment of conviction. See *State* v. *Andrews*, supra, 313 Conn. 324.

On October 28, 2014, the petitioner, representing himself, filed a petition for a writ of habeas corpus. On April 20, 2017, after assigned habeas counsel had appeared on his behalf, the petitioner filed his operative three-count second amended petition for a writ of habeas corpus (second amended petition).[3] In counts one and two of the second amended petition, the petitioner alleged that, in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the state failed to disclose to him a purportedly exculpatory written statement given to the Waterbury Police Department in 2003 by an individual named Norman Reynolds. In count three of the second amended petition, the petitioner alleged that Skyers rendered ineffective assistance by failing (1) to conduct a reasonably diligent investigation and, thereby, failing to discover Reynolds as a defense witness, (2) to call Reynolds as a defense witness, and/or (3) otherwise to provide the petitioner with a reasonable defense. On June 6, 2017, the respondent, the Commissioner of Correction, filed a return, leaving the petitioner to his proof.

On December 14, 2017, the habeas court, *Sferrazza*, *J.*, held a one day trial. The court heard testimony from the petitioner, Reynolds, Skyers, and Frank Riccio, who testified as an expert witness on behalf of the petitioner. On March 29, 2018, the parties filed posttrial briefs. On April 16, 2018, the court issued a memorandum of decision denying the second amended petition. Thereafter, the petitioner filed a petition for certification to appeal from the judgment denying the second amended petition, which the court denied. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The petitioner first claims that the habeas court abused its discretion in denying his petition for certification to appeal from the judgment denying the second

amended petition. We disagree.

We "begin by setting forth the procedural hurdles that the petitioner must surmount to obtain appellate review of the merits of a habeas court's denial of the [amended] habeas petition following denial of certification to appeal. In *Simms* v. *Warden*, 229 Conn. 178, 187, 640 A.2d 601 (1994), [our Supreme Court] concluded that . . . [General Statutes] § 52-470 (b) prevents a reviewing court from hearing the merits of a habeas appeal following the denial of certification to appeal unless the petitioner establishes that the denial of certification constituted an abuse of discretion by the habeas court. In *Simms* v. *Warden*, 230 Conn. 608, 615–16, 646 A.2d 126 (1994), [our Supreme Court] incorporated the factors adopted by the United States Supreme Court in *Lozada* v. *Deeds*, 498 U.S. 430, 431–32, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991), as the appropriate standard for determining whether the habeas court abused its discretion in denying certification to appeal. This standard requires the petitioner to demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . A petitioner who establishes an abuse of discretion through one of the factors listed above must then demonstrate that the judgment of the habeas court should be reversed on its merits. . . . In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous." (Emphasis in original; internal quotation marks omitted.) *Grover* v. *Commissioner of Correction*, 183 Conn. App. 804, 811–12, 194 A.3d 316, cert. denied, 330 Conn. 933, 194 A.3d 1196 (2018).

For the reasons set forth in part II of this opinion, we conclude that the petitioner has failed to demonstrate that (1) his claims are debatable among jurists of reason, (2) a court could resolve the issues in a different manner, or (3) the questions are adequate to deserve encouragement to proceed further. Thus, we conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal.

II

Turning to the petitioner's substantive claim on appeal, the petitioner asserts that the habeas court erroneously concluded that he did not sustain his burden of demonstrating that Skyers rendered ineffective assistance by failing to investigate and call Reynolds as a witness at the petitioner's criminal trial and to present a defense predicated on Reynolds' testimony and the written statement provided by Reynolds to the Waterbury Police Department in 2003. For the reasons set

forth subsequently in this opinion, the petitioner's claim fails.

We begin by setting forth the relevant standard of review and legal principles that govern our review of the petitioner's claim. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review. . . .

"[I]t is well established that [a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington*, [466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. . . . As enunciated in *Strickland* v. *Washington*, supra, 466 U.S. 687, this court has stated: It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: [1] a performance prong and [2] a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, [the petitioner] must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The [petitioner's] claim will succeed only if both prongs are satisfied." (Citation omitted; internal quotation marks omitted.) *Chance* v. *Commissioner of Correction*, 184 Conn. App. 524, 533–34, 195 A.3d 422, cert. denied, 330 Conn. 934, 194 A.3d 1196 (2018).

The following additional facts are relevant to our resolution of the petitioner's claim. At the habeas trial, the petitioner called Reynolds as a witness. Reynolds testified that, in 1999, while he was incarcerated at the Brooklyn Correctional Institution, Smith confessed to Reynolds that he had murdered the victim. Reynolds further testified that, after hearing Smith's confession, Reynolds contacted the Office of the State's Attorney, which ultimately led to a meeting between Reynolds and the Waterbury Police Department in 2003, during which Reynolds provided the police with a signed, sworn written statement (Reynolds' statement). Reynolds' statement, which was admitted into evidence at the habeas trial, provided, in pertinent part, the following regarding Smith's confession: "[Smith] said that he

ha[d] something to get off his chest that[’d] been eating him up inside. [Reynolds] asked him what it was and [Smith told Reynolds] he killed [the victim], he said that it was an accident, he did not mean to kill her. [Smith] said that one night he was up on Burton Street. He said that he was running [drug] sales for ‘Boo-Boo’ Slade. [The petitioner] was also running sales. At one point, [the victim] showed up and [the petitioner] brought her to a house on Burton Street to get high. [Smith] said that he also went to Burton Street with them to get high. Boo-Boo Slade also showed up at the house and all of them ‘tricked’ with [the victim], meaning that they had sex with her. [Smith] said that after this, he and Boo-Boo went back outside and he was running drug sales for [Boo-Boo] Slade. [Smith] said that he would go back to where [the victim] was on Burton Street, and get some money so he could [buy] some more base to smoke with [the victim]. At one time, [Smith] said that he went back to smoke some base with [the victim], he began to have sex with [the victim]. He said one leg was out of her pants. He said [the victim] began resisting him, and [Smith] said that he started hitting her and smacking her around. [Smith] said that [the victim] tried pushing him off her, and he began choking her and smacking her because she was fighting back. [Smith] said that after that, he left Burton Street. [Smith] told [Reynolds] that it was an accident, he didn’t mean to kill her.”[4]

Reynolds also testified that in February, 2012, he provided testimony in a separate jury trial held in a criminal matter filed against Smith.[5] The transcripts of Reynolds’ testimony at Smith’s trial, which were admitted into evidence at the habeas trial, reflect that Reynolds provided the following testimony, in pertinent part, on direct examination concerning Smith’s confession:

“Q. And what was it that [Smith] told you?

“A. [Smith] told me he killed [the victim].

“Q. Tell us in as much detail as you can remember what specifically [Smith] told you.

“A. He said there was him, [the petitioner] . . . [a]nd another guy named [Boo-Boo] Slade, they [were] running [narcotic] sales for them and they were getting high on Burton Street in the basement—I believe, the basement. And they brought [the victim] down there and they—they—had sex with [her] for drugs.[6]

“Q. And then what happened after that, what did [Smith] tell you?

“A. They—they left—back up—[Smith] said they went back up and started running more sales—

“Q. Who’s *they* went back up?

“A. Him, [the petitioner], and [Boo-Boo].

\* \* \*

"Q. And after they had had sex with [the victim] down in the basement what happened after that, what did they—what did [Smith] . . . tell you happened after that?

"A. [Smith] said they went upstairs, they went back up, them three, [the victim] was still downstairs I believe. Then [Smith] said he went back downstairs to get more money from [the victim], I believe, to get more money from her. . . .

"Q. [Smith] goes back down to [the victim] to get more money.

"A. Right.

"Q. Okay.

"A. And I guess they were starting to [get] high and said they'd been having sex again.

"Q. Who said they were having sex again?

"A. [Smith]. He described to me how—he had one pant—one—one—one of her pant legs off of her, one was on, one was off. He was having sex and she started resisting and he wouldn't stop and that's when he started just punching, strangling, choking her.

"Q. Who told you that [Smith] was choking her?

"A. [Smith] told me that.

"Q. Any doubt about that?

"A. That's what [Smith] said to me so, no.

"Q. How about the smacking around or punching her, who told you that?

"A. [Smith] did.

"Q. And what happened after that?

"A. [Smith] was choking her and he says it was an accident." (Emphasis in original; footnote added.)

Additionally, the petitioner's counsel elicited the following relevant testimony from Reynolds on direct examination at the habeas trial:

"Q. And just kind of with respect to [the petitioner's] involvement, did your testimony [at Smith's trial] kind of involve what [the petitioner] had to [do] with this whole case?

"A. Actually, I believe [the petitioner] had nothing to do with it at all because it was about [Smith].

"Q. So what did [Smith], his conversation with you, his—well, we'll call—

"A. The only thing that [Smith] mentioned about [the petitioner] is that [the petitioner] had bought a house, and that was just what he said to me. I don't know if that actually happened. [Smith] never implicated [the

petitioner] in committing a crime with him. None of the sorts, and I never heard that [the petitioner] had anything to actually do with the crime.

"Q. So when [Smith] confided in you, when he confessed to you . . . his confession basically was that he was downstairs in a basement with [the petitioner] and with [the victim] and another individual. Correct?

"A. I don't—I can't recall who he said he, who he was down there with. It's been some time, but I can't recall what he said.

\* \* \*

"Q. So you testified [at Smith's trial] that [the petitioner]—well, [Smith] told you that [the petitioner] was down in that basement at one point?

"A. Yes. Yes.

"Q. However, [the petitioner] left, and when he left [the victim] was still alive?

"A. Yes.

\* \* \*

"Q. So that's [what Smith] confided in you that . . . he went back down to that basement alone without [the petitioner]?

"A. Right.

"Q. And he accidentally killed [the victim]?

"A. Yes.

"Q. And [the petitioner] was not present when that happened?

"A. Not at all. Never mentioned [the petitioner] being back down there at the time.

"Q. Are you aware that [the petitioner] also had a trial in the death of [the victim]?

"A. Yeah. Which I was kind of surprised at.

"Q. And why were you surprised?

"A. Because [the petitioner] wasn't there, wasn't present at the time when [the victim] was killed based on what [Smith] had said to me. . . .

"Q. And if you had been asked to testify in [the petitioner's] case, would you have testified?

"A. There would be nothing to testify to because I knew nothing of him being in the basement at the time of the murder.

"Q. Well, if they ask you about what [Smith] had told you and how he had confided in you, would you have testified to that?

"A. I would testify what [Smith] had said to me, yes."

On cross-examination, the respondent's counsel elic-

ited the following relevant testimony from Reynolds:

"Q. And who sexually assaulted the victim according to your conversation with [Smith]?

"A. According to me, I believe [Smith] said him and someone else had sex with her. I guess a group of people. I don't know specifically who, but he said—I know he said they, and I don't know who's they are.

* * *

"Q. You had testified earlier, and I'll have the court reporter read it back for you if we need to. When I asked you whether or not [Smith] knew who sexually assaulted [the victim], did you or did you not say that there were other people there and you used the word they? Did you or did you not testify to that?

"A. Yes. I did say that.

"Q. Okay. So did [Smith] indicate in your conversation with him that there were other people present at the time of the murder?

"A. Yes.

"Q. Okay. Did [Smith] indicate who else was present at the time that [the victim] was murdered?

"A. I can't recall that if someone else was present or—

"Q. Did [Smith] indicate whether or not other people were present when [the victim] was sexually assaulted?

"A. Yes.

"Q. And who did [Smith] indicate was present while [the victim] was sexually assaulted?

"A. I can't recall."

On redirect examination, the petitioner's counsel then elicited the following relevant testimony from Reynolds:

"Q. And now I'm just going to try to clarify your testimony with respect to your statement. I think you might have gotten a little confused. So—

"A. Yeah.

"Q. You testified [o]n February 29 of 2012 [at Smith's trial,] that [Smith] told you the three individuals were downstairs tricking with [the victim]?

"A. Yes.

"Q. And then that those three individuals then went back upstairs?

"A. Um-hum.

"Q. And one of those individuals who left and went back upstairs was [the petitioner]?

"A. Yes.

"Q. And then [Smith] alone went back downstairs?

"A. Went back downstairs, yes. . . .

"Q. So what was your testimony with respect to after [the petitioner] had left being downstairs with [the victim]?

"A. Yeah. He went back downstairs.

"Q. Who's he?

"A. [Smith] . . . went back downstairs and began to have sex with [the victim].

"Q. And is that when [Smith] began sexually assaulting [the victim]?

"A. Yes.

"Q. And at that point in time, did [Smith] say that that is when he accidentally killed [the victim]?

"A. Right. [Smith] said it was an accident.

"Q. And he told you that at that point in time [the petitioner] was not present?

"A. [The petitioner] was not there. He left, went upstairs, and he went—[Smith] went back downstairs by himself.

"Q. So [the petitioner] was not present when—

"A. Was not present.

"Q. —[the victim] was killed by [Smith]?

"A. Correct."

In its memorandum of decision, after disposing of the petitioner's *Brady* claims,[7] the habeas court addressed the petitioner's ineffective assistance of counsel claim. The court summarized the petitioner's claim as follows: "Essentially, the petitioner faults [Skyers] for failing to obtain a copy of Reynolds' statement, to have Reynolds interviewed, and to call Reynolds as a witness at the petitioner's criminal trial. The putative utility of Reynolds' testimony would have been to inform the jury that Smith never implicated anyone else when he sought catharsis by painfully revealing to Reynolds that he 'accidentally' killed the victim when subduing her. The petitioner further submits that had Reynolds so testified, then it is reasonably probable that the jury would have acquitted the petitioner." The court proceeded to reject this claim.

First, the court concluded that the petitioner could not prevail on the ground that Skyers' poor investigation deprived the petitioner of the content of Reynolds' statement because, as it had found in denying the petitioner's *Brady* claims, Reynolds' statement was incorporated, verbatim, in an arrest warrant application, which Skyers had received and reviewed shortly after having been assigned as the petitioner's criminal defense counsel. Then, assuming, arguendo, that Skyers rendered deficient performance by failing to call Reynolds as a wit-

ness at the petitioner's criminal trial, the court concluded that the petitioner failed to demonstrate prejudice. The court found that Reynolds stated that "because Smith never mentioned coparticipants in the shake-down of the victim when he killed her, Reynolds *assumed* no one else was involved" in the victim's murder. (Emphasis in original.) The court determined that, although Reynolds would have been permitted to testify as to Smith's "expiation" at the petitioner's criminal trial, evidence regarding Reynolds' "assumption" that no one other than Smith was involved in the victim's murder would have been inadmissible as a lay opinion not based on personal knowledge. In addition, the court determined that, had evidence of Smith's confession to Reynolds been introduced at the petitioner's criminal trial, it was highly improbable that the jury would have drawn the inference that there were no other individuals present when Smith killed the victim because of the "other damning evidence" presented against the petitioner. Specifically, the court stated that (1) Russell testified at the petitioner's criminal trial that she was in the basement of the Burton Street residence on the night of the victim's murder and (a) saw the victim with the petitioner, Smith, and Daniel, (b) heard the petitioner and the victim arguing about drugs, (c) observed the petitioner choke the victim while Smith pinned her arms down and Daniel removed her clothing, and (d) heard the three men threaten the victim that they were going to have sex with her "one way or the other," and (2) the petitioner's written statement following his arrest corroborated Russell's testimony and incriminated him, as he admitted that he grabbed the victim by her neck and hit her and that Smith subsequently began to choke the victim, at which point she "started to go out . . . ." The court found that both Smith's confession to Reynolds and the petitioner's written statement were consistent to the extent that Smith caused the victim's death, and that "Reynolds' memory of Smith's confession lacked reference to others, but it fail[ed] to exclude others, also." For these reasons, the court "retain[ed] high confidence in the jury's verdict despite the addition of Reynolds' recollection [of Smith's confession to Reynolds] to that mix."

On appeal, the petitioner claims that the habeas court erred in concluding that he failed to establish that Skyers' alleged deficient performance—namely, Skyers' failure to investigate and call Reynolds as a witness at the petitioner's criminal trial and to present a defense predicated on Reynolds' statement and testimony— prejudiced him.[8] Specifically, the petitioner contends that the evidence in the record establishes that Smith told Reynolds that the petitioner was not in the basement of the Burton Street residence with Smith when Smith murdered the victim and, thus, the court's factual findings that Smith's confession to Reynolds did not exclude the presence of others at the time of the victim's

death and that Reynolds merely assumed that the petitioner was not present when the victim was murdered were clearly erroneous. The petitioner further contends that Smith's confession would have exonerated the petitioner of felony murder by establishing that Smith, alone, murdered the victim and that the petitioner was not present when the murder was committed.[9] Therefore, the petitioner asserts, there is a reasonable probability that the outcome of his criminal trial would have been different had the jury been presented with Reynolds' statement and testimony from Reynolds regarding Smith's confession to Reynolds. The respondent argues that the court's findings are supported by the record and that the court correctly concluded that the petitioner failed to demonstrate prejudice, inter alia, because it was not reasonably probable that evidence regarding Smith's confession to Reynolds, even if it had been introduced at the petitioner's criminal trial, would have changed the outcome of the trial. We agree with the respondent.[10]

A

We first turn to the petitioner's argument that the habeas court's factual findings that Smith's confession to Reynolds did not exclude the presence of others in the basement of the Burton Street residence when Smith killed the victim and that Reynolds only assumed that no one else was with Smith when Smith killed the victim are clearly erroneous. We are not persuaded.

"[A] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Ham* v. *Commissioner of Correction*, 187 Conn. App. 160, 173, 201 A.3d 1074, cert. denied, 331 Conn. 904, 202 A.3d 373 (2019).

Contrary to the petitioner's assertion, the evidence in the record does not indicate that Smith told Reynolds that the petitioner was not present when Smith murdered the victim. Both Reynolds' statement and Reynolds' testimony at Smith's trial indicate that Smith killed the victim, but neither suggests that Smith stated to Reynolds that the petitioner was not present at the time of the victim's death. At the habeas trial, Reynolds' testimony on direct examination, coupled with excerpts of Reynolds' testimony from Smith's trial, indicate that Reynolds "believe[d]" that the petitioner had nothing to do with the victim's murder, that Smith never implicated the petitioner in the victim's murder, that he had "never heard" of the petitioner being involved in the victim's murder, that Smith never "mentioned" the petitioner accompanying Smith when Smith murdered the victim, that the petitioner was not present when the victim was murdered "based on what [Smith] had said to [him]," and that Smith had returned to the basement alone after

Smith, the petitioner, and a third individual had exited the basement at some point prior to the victim's death. None of the foregoing evidence reflects that Smith ever stated to Reynolds that the petitioner was not present at the time that Smith murdered the victim; instead, it supports the court's findings that Smith's confession did not exclude the presence of others at the crime scene when Smith murdered the victim and that Reynolds merely presumed that the petitioner was absent. On redirect examination, the petitioner's counsel asked Reynolds explicitly whether Smith had told him that the petitioner was not present when Smith murdered the victim. Reynolds testified in response: "[The petitioner] was not there. He left, went upstairs, and he went—[Smith] went back downstairs by himself." Reynolds then reiterated that the petitioner "[w]as not present" when Smith killed the victim. Notably, however, Reynolds did not testify that Smith *told* him that the petitioner was absent from the crime scene when the victim died; rather, he repeated his prior testimony, untethered to any particular statement by Smith, that the petitioner was not present when Smith murdered the victim.

Following our careful review of the record, we conclude that the court's findings that Smith's confession to Reynolds did not exclude the presence of others in the basement of the Burton Street residence at the time of the victim's murder and that Reynolds assumed that the petitioner was not with Smith when Smith murdered the victim are amply supported by the evidence in the record, and we are not left with a definite and firm conviction that the court committed a mistake. Thus, the court's findings are not clearly erroneous.

### B

Having concluded that the habeas court's findings contested by the petitioner are not clearly erroneous, we now address the petitioner's claim that the court erred in concluding that the petitioner failed to satisfy the second prong of *Strickland*. This claim is unavailing.

"When defense counsel's performance fails the [first prong of *Strickland*], a new trial is required if there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The question, therefore, is whether there is a reasonable probability that, absent the errors, the [fact finder] would have had a reasonable doubt respecting guilt. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, *Strickland* asks whether it is reasonably likely the result would have been different.

. . . The likelihood of a different result must be substantial, not just conceivable." (Citation omitted; internal quotation marks omitted.) *Dupigney* v. *Commissioner of Correction*, 183 Conn. App. 852, 859, 193 A.3d 1274, cert. denied, 330 Conn. 942, 195 A.3d 1135 (2018).

We agree with the habeas court that the petitioner failed to demonstrate that he was prejudiced by Skyers' alleged deficient performance because, even if Smith's confession to Reynolds had been presented to the jury at the petitioner's criminal trial, there is no reasonable probability that the outcome of the trial would have been different. Russell testified at the petitioner's criminal trial, inter alia, that she observed the petitioner choking the victim in the basement of the Burton Street residence alongside Smith and another individual. In addition, in a written statement to the police, the petitioner admitted to grabbing the victim by the neck and hitting her, and he observed Smith choke the victim until "she started to go out . . . ." As the court reasonably determined, Russell's testimony and the petitioner's written statement constituted "damning evidence" inculpating the petitioner for felony murder. Moreover, as we concluded in part II A of this opinion, the court found, without error, that Smith's confession to Reynolds did not exclude the presence of others, which would include the petitioner, at the time that Smith murdered the victim. As the court further found, Smith's confession corroborated the petitioner's account that Smith caused the victim's death. Given the totality of the incriminating evidence introduced at the petitioner's criminal trial, we are not convinced that Smith's confession to Reynolds would have affected the jury's verdict and, thus, the petitioner has failed to undermine our confidence in the outcome of his criminal trial.

In sum, we conclude that the habeas court properly determined that the petitioner failed to establish that he was prejudiced by Skyers' alleged deficient performance. Therefore, the court did not abuse its discretion in denying the petitioner's petition for certification to appeal.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] We deem the petitioner's state constitutional claims abandoned because he has failed to provide an independent analysis under our state constitution. See *Ham* v. *Commissioner of Correction*, 187 Conn. App. 160, 173 n.3, 201 A.3d 1074, cert. denied, 331 Conn. 904, 202 A.3d 373 (2019).

[2] General Statutes § 53a-54c was amended by No. 15-211, § 3, of the 2015 Public Acts, which made changes to the statute that are not relevant to this appeal. For purposes of clarity, we refer to the current revision of the statute.

[3] On April 18, 2017, the petitioner filed his first amended petition for a writ of habeas corpus.

[4] The evidence introduced at the habeas trial reflects that the petitioner was also known as "Pretty Rick" and that Smith was also known as "Smooth." For purposes of clarity, we refer to them as the petitioner and Smith, respectively, throughout this opinion.

[5] With respect to the victim's murder, Smith was charged with murder in violation of § 53a-54a (a) and felony murder in violation of § 53a-54c. Following trial, Smith was convicted of both counts and, subsequently, the trial

court sentenced him to sixty years of incarceration. Our Supreme Court affirmed Smith's judgment of conviction on appeal. See *State* v. *Smith*, 313 Conn. 325, 360, 96 A.3d 1238 (2014).

[6] The transcript of Reynolds' testimony at Smith's trial reflects that Reynolds testified that "they brought *Boo-Boo* down there and they – they – had sex with *him* for drugs." (Emphasis added.) Reynolds' subsequent testimony suggests, however, that it was the victim, not "Boo-Boo," who was brought to the basement and with whom the petitioner, Smith, and "Boo-Boo" had sex.

[7] In counts one and two of the second amended petition, the petitioner alleged that the state violated *Brady* by failing to disclose Reynolds' statement to the petitioner. In its memorandum of decision, the habeas court rejected those claims, determining that Reynolds' statement, verbatim, was contained in an arrest warrant application, which Skyers had received and reviewed shortly after he had been assigned as the petitioner's criminal defense counsel. The petitioner does not challenge on appeal the portion of the judgment denying his *Brady* claims.

[8] The petitioner does not claim on appeal that the habeas court erred in rejecting his specific argument that Skyers rendered ineffective assistance by conducting an inadequate investigation that deprived the petitioner of the *content* of Reynolds' statement.

[9] General Statutes § 53a-54c provides: "A person is guilty of murder when, acting either alone or with one or more persons, such person commits or attempts to commit robbery, home invasion, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, such person, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[10] We observe that "[a] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [petitioner] as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffective claim on the ground of lack of sufficient prejudice . . . that course should be followed." (Internal quotation marks omitted.) *Dupigney* v. *Commissioner of Correction*, 183 Conn. App. 852, 860, 193 A.3d 1274, cert. denied, 330 Conn. 942, 195 A.3d 1135 (2018). Here, as it was permitted to do, the habeas court assumed, arguendo, that Skyers' performance was deficient and proceeded to consider whether the petitioner had demonstrated prejudice. Thus, although the parties, in their respective appellate briefs, have analyzed whether Skyers' performance was deficient, we need not address the performance prong of *Strickland* on appeal. Id. We briefly note, however, that the petitioner's proposed theory of defense predicated on Reynolds' statement and testimony—that the petitioner, although present at the Burton Street residence on the night of the victim's murder, was not with Smith in the basement when Smith murdered the victim—would have wholly contradicted the theory of defense presented by the petitioner, based on his own testimony, that he was not at the Burton Street residence at all that night.